# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

№ 19-CV-6701 (RPK) (RER)
_____

## DUANE A. HINES,
_on behalf of himself and all others similarly situated,_

Plaintiff,

VERSUS

## EQUIFAX INFORMATION SERVICES, LLC,

Defendant.

_____

**REPORT & RECOMMENDATION**

July 16, 2022
_____

**TO THE HONORABLE RACHEL P. KOVNER
UNITED STATES DISTRICT JUDGE**

**RAMON E. REYES, JR., U.S.M.J.:**

Duane A. Hines ("Hines" or "Plaintiff") brings this action on behalf of himself and similarly situated consumers against Equifax Information Services, LLC ("Equifax or "Defendant"), a Georgia-based consumer reporting agency, seeking monetary, injunctive, and declaratory relief for alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x, and the New York Fair Credit Reporting Act ("NYFCRA"), N.Y. Gen. Bus. Law §§ 380–380-v. (ECF No. 1 ("Compl.")). Plaintiff has moved pursuant to Rule 23 of the Federal Rules of Civil Procedure to certify a nationwide FCRA class and three claim-based subclasses as described in further detail

1

below. (ECF No. 43 ("Mot. for Class Cert."); ECF No. 42-2 SEALED ("Pl's Mem.") at 3–4). Your Honor has referred the motion to me for a report and recommendation. (Order dated 03/22/2022).

For the reasons set forth below, I respectfully recommend that the motion be granted in part and denied in part. The Court should (1) grant Plaintiff's request for certification of the New York Subclass and the Capital One Subclass under Rule 23(b)(3); (2) deny Plaintiff's request for certification of the nationwide FCRA Class for failure to satisfy the superiority requirement of Rule 23(b)(3), or alternatively order further briefing from the parties on the issue of whether a stay, consolidation, or transfer of proceedings is warranted in light of the pending *Rivera* Action; (3) deny Plaintiff's request for certification of the Post-Dispute Publication Subclass for failure to satisfy the predominance requirement of Rule 23(b)(3); (4) deny Plaintiff's request for certification under Rule 23(b)(2) with respect to the New York Subclass; (5) appoint Plaintiff as the class representative and Francis Mailman Soumilas, P.C., Robert S. Sola, P.C., Skaar & Feagle, LLP, The Adkins Firm, P.C. as class counsel; and, (6) direct the parties to submit to the Court within thirty days proposed forms and schedules for providing notice to the certified classes.

## **BACKGROUND**

I.  <u>Consumer Reporting Agencies, the Fair Credit Reporting Act, and the NYFCRA</u>

As "one of the 'Big Three' [consumer] reporting agencies," Equifax "compiles personal and financial information about individual consumers to create consumer reports" and "sells those consumer reports [also known as credit reports] for use by entities such as banks, landlords, and car dealerships [*i.e.*, Equifax's customers] that request information about the creditworthiness of individual consumers." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2201 (2021); *see also* (Compl. ¶ 7 (explaining that "Equifax prepares consumer report[s] (commonly called 'credit report[s]'")). Consumer reports may include up to two years' worth of "inquiry information,"

which is comprised of notations on the consumer's credit file that identify the entities or individuals who requested information about the consumer from the reporting agency and the date such information was delivered. (Compl. ¶¶ 7–8; Pl's Mem. at 1; ECF No. 42-3 SEALED ("Def's Opp.") at 4 (citing ECF No. 42-24 SEALED ("Gobin Depo. Excerpts") 30:24–31:1; 16 C.F.R. § 660.2(c)); *see also* ECF No. 42-25 SEALED ("Gobin Decl.") ¶ 3).

An inquiry may be considered either "soft" or "hard." An inquiry is "soft" when it is made as part of an ongoing relationship between the inquirer and the consumer, relates to employment screening, or will otherwise leave the consumer's credit score unaffected. Conversely, an inquiry is "hard" when it is associated with a consumer-initiated application for credit and may therefore impact the consumer's credit score. (*See* Pl's Mem. at 1; ECF No. 42-22 SEALED ("Hendricks Expert Rep.") at 1 n.1 ████████████████████████████████████████████ ; *id.* at 1 ██████████████████████████████████ ████████████████████████████████████████████ ; ECF No. 42-32 SEALED ("Hines Depo. Exhibits") at 15 ██████████████ ██████████████████████ Compl. ¶ 9 ("Inquiries have a negative impact on a consumers credit score because scoring programs view each inquiry as an application for credit[.]"); ECF No. 42-34 SEALED ("Turner Expert Rep.") ¶ 2 n.1 (describing difference between hard and soft inquiries); ECF No. 42-5 SEALED ("Gobin Depo. Tr.") at 12:7–20, 17:2–11 (same)); Equifax Knowledge Ctr., *Understanding Hard Inquiries on Your Credit Report*, Equifax (last visited May 24, 2022) (indicating that hard inquiries "tell a lender that you are currently shopping for new credit[;]" "may be meaningful to a potential lender when assessing your creditworthiness[;]" and "usually impact credit scores.").[1] *But see* (Def's Opp. at 8–9 ("Inquiries have varying impacts on

---

[1] https://www.equifax.com/personal/education/credit/report/understanding-hard-inquiries-on-your-credit-report/.

individual consumers—if they have any impact at all—depending on factors that are unique to each consumer and each credit score. . . ███████████████████████████████

██████████ (citing Turner Expert Rep. ¶¶ 27–45; ECF No. 45-2 ("Hendricks Depo. Tr.") at 63:5–17, 66:22–69:4)).

"[T]o promote 'fair and accurate credit reporting' and to protect consumer privacy," the FCRA "regulates the consumer reporting agencies that compile and disseminate personal information about consumers" and "'imposes a host of requirements concerning the creation and use of consumer reports.'" *Ramirez*, 141 S. Ct. at 2200 (first quoting 15 U.S.C. § 1681(a), then quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 335 (2016)). As relevant here, the Act requires that consumer reporting agencies: (1) properly reinvestigate or remove incomplete or inaccurate information contained in a consumer's file upon direct notice of a dispute from the consumer, 15 U.S.C. § 1681i(a); (2) "maintain reasonable procedures designed . . . to limit the furnishing of consumer reports to the [permissible] purposes" specifically enumerated in the Act, 15 U.S.C. §§ 1681b, 1681e(a); and (3) refrain from furnishing records of non-consumer-initiated inquiries to third parties, 15 U.S.C. § 1681b(c)(3). "The Act creates a cause of action for consumers to sue and recover damages for certain violations," including actual, statutory, or punitive damages for willful noncompliance with its requirements, and actual damages for negligent noncompliance. *Ramirez*, 141 S. Ct. at 2201; 15 U.S.C. §§ 1681n(a), 1681*o*.

The NYFCRA deals with the same subject matter and contains substantively similar provisions to the FCRA. Like its federal counterpart, the NYFCRA directs consumer reporting agencies to reinvestigate information that is directly disputed by a consumer, requires that they adopt procedures to limit the furnishing of consumer reports to a set of enumerated permissible purposes, and provides for civil liability for negligent or willful noncompliance with its provisions. N.Y.

4

Gen. Bus. Law §§ 380-f(a), 380-k, 380-m, 380-*l*. Because of these substantial similarities, the provisions of the FCRA and the NYFCRA are generally "construed in the same way." *Scott v. Real Estate Fin. Grp.*, 183 F.3d 97, 100 (2d Cir. 1999); *see also Abdallah v. LexisNexis Risk Sols. FL Inc.,* No. 19-CV-3609 (MKB), 2021 WL 6197060, at *6 (E.D.N.Y. Dec. 30, 2021); *Grayson v. Equifax Credit Info. Servs.*, No. 18-CV-6977 (MKB), 2021 WL 2010398, at *7 (E.D.N.Y. Jan. 29, 2021).

II.  Hines' Hard Inquiry Dispute

Equifax reported a November 27, 2018 "hard" inquiry by Capital One Bank USA N.A. on Hines' consumer report (the "Capital One Inquiry") in connection with a transaction that Hines claims he did not initiate or authorize. (Compl. ¶¶ 30–31; *see also* Pl's Mem. at 4; ECF No. 42-7 SEALED ("12/7/2018 Consumer Report") at 8; ECF No. 44-2 ("Hines Depo. Tr.") at 12:14–18; 33:10–21; Gobin Depo. Tr. at 18:19–19:3). Concerned that it would negatively impact his credit score, Hines disputed the Capital One Inquiry to Equifax twice through a Consumer Financial Protection Bureau ("CFPB") complaint portal in early December 2018. (Compl. ¶ 32; *see also* Hines Depo. Tr. at 12:14–18, 33:10–21; Hines Depo. Exhibits at 2–9 (CFPB Complaint 181204-3669026); *id.* at 10–12 (CFPB Complaint 181204-3669303); ECF No. 42-33 SEALED ("Pl's Resps. to Def's First Interrogs.") at 9–10 (listing CFPB complaints)).[2]

On December 7, 2018, Equifax responded to Hines' complaints with a form letter ███████  ███████████████████████████████████████████████████████ (ECF No. 42-8 SEALED ("Dec. 7, 2018 Equifax Resp. Ltr.") at 2). In this letter, Equifax explained that ███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[2] The FCRA specifically contemplates the submission of complaints to consumer reporting agencies through the CFPB. *See* 15 U.S.C. § 1681i(e).

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████. (*Id.*). Equifax reported the formal "results of [its] reinvestigation" into the Capital One Inquiry as follows: "Inquiries are a factual record of file access. If you believe this was unauthorized, please contact the creditor. If you have additional questions about this item please contact [Capital One]." (*Id.* at 5–6; *see also* Pl's Mem. at 4).

In July 2019, Hines submitted a third complaint through the CFPB portal—this time directed at Capital One—disputing the Capital One Inquiry as unauthorized, and demanding either an affidavit from a bank representative affirming its accuracy or the removal of the inquiry from his credit file. (Hines Depo. Exhibits at 13–14 (CFPB Complaint 190724-4249764)). Capital One responded the following month, noting that it "was unable to locate any previous disputes of this inquiry" and had "received an application for credit using [Plaintiff's] information" on November 17, 2018, but that after reviewing his complaint, it "made a business decision to ask the Consumer Reporting Agencies" to remove the inquiry. (Hines Depo. Exhibits at 15–16). In light of that business decision, Capital One reported that on August 5, 2019, it "sent a request to the Consumer Reporting Agencies (CRAs) asking them to remove the hard inquiry." (Compl. ¶ 34; Hines Depo. Exhibits at 15–16). In its letter, Capital One indicated that those agencies would ultimately determine how the change would be reflected in his credit file, that the inquiry could be changed to a soft inquiry, and that it could take up to sixty days for the agency to update its records. (Hines Depo. Exhibits at 15–16).

In September 2019, Hines submitted a fourth complaint through the CFPB portal to Equifax, arguing that Capital One's reported inability to locate previous disputes of the inquiry demonstrated that Equifax never performed a reasonable reinvestigation in response to his initial

disputes and expressing dissatisfaction that Equifax had not yet complied with the bank's request to delete the Capital One Inquiry from his consumer report. (Hines Depo. Exhibits at 17–21, 32–37 (CFPB Complaint 190908-4376677); *see also* Pl's Mem. at 5). Days later, Equifax responded with the same formulaic response as in December 2018: "Inquiries are a factual record of file access. If you believe this was unauthorized, please contact the creditor." (Compl. ¶ 42; Hines Depo. Exhibits at 22–25, 38–73). In October 2019, Hines submitted a fifth complaint to Equifax directly via certified mail, and received the same form response three weeks later. (Compl ¶¶ 36–39, 42; Hines Depo. Exhibits at 27–31).

Hines alleges that, despite his repeated complaints, Equifax included the disputed Capital One Inquiry in certain reports to his potential and existing creditors. (Pl's Mem. at 8–9; *see also* Compl. ¶ 44 ("Notwithstanding ample notice that Hines had not initiated nor authorized [the] Capital One inquiry, Equifax reported it to Hines' potential and existing creditors on numerous occasions, including to Digital Federal Credit Union on December 10, 2018 and March 30, 2019, to Factual Data on December 31, 2018."); Hines Depo. Tr. at 14:17–16:10 (alleging that Digital Credit Union and Paypal were provided with Hines' consumer information, including the disputed Capital One Inquiry); ECF No. 42-17 SEALED ("Leslie Depo. Tr.") at 50:13–51:3, 57:7–58:7 (discussing post-dispute June 2019 inquiry by Synchrony Bank/Paypal)).

Ultimately, Equifax removed the Capital One Inquiry approximately four months after receiving Capital One's request and shortly after this suit was filed in November 2019. (*See* Gobin Depo. Tr. at 20:17–21:5, 48:13–52:4; *see also* Hines Depo. Tr. at 18:1–5). Nevertheless, Hines alleges that as a result of Equifax's failure to adequately reinvestigate his disputes and its delay in removing the Capital One Inquiry, he has been subjected to a number of injuries, including: a reduced credit score; "deprivation of the information that Equifax had not reinvestigated his

dispute or contacted Capital One which, at a minimum, would have armed him with additional information concerning his creditworthiness; [t]he invasion of his privacy when Equifax provided a consumer report about him to Capital One without a permissible purpose; [d]istress from getting the run around from Equifax concerning his disputes and what Equifax would actually do to investigate them; and [l]ost time and resources in association with making multiple ignored disputes[.]" (Compl. ¶ 45; *see also* Hines Depo. Tr. at 62:2–15, 118:19–119:1).

III.  <u>Equifax Policies and Class Members' Disputes</u>

The nature of Hines' hard inquiry dispute is not uncommon, and similar complaints are contemplated by Equifax's standardized policies and procedures. According to Equifax,



(Gobin Decl. ¶ 20). In general, Equifax

(Gobin Decl. ¶¶ 3, 5). Nevertheless, Equifax maintains that

(Gobin Decl. ¶¶ 5, 6, 9). In such cases,

(Gobin Decl. ¶ 9). The form letter that consumers receive in these circumstances, and which Hines received here, is known internally at Equifax as "                ." (Gobin Depo. Tr. at 28:19–29:11, 39:18–22; ECF No. 42-13 SEALED ("Equifax Dispute Policy Manual v.17") at 37; ECF No. 42-14 SEALED ("Equifax Dispute Policy Manual v.22") at 35; ECF No. 42-20 SEALED ("Equifax Training & QA") at 3;

Pl's Mem. at 6). ██████████████████████████████████████

██████████████████████████████████████████████████████

███████████. (ECF No. 42-15 SEALED ("Def's Resps. to Pl's First Set of Interrogs.") at 6).

According to the agency, ████████████████████████████████████

████████████████████████████████████ (*Id.* at 8).

In the two years preceding Hines' class action complaint, Equifax received hard inquiry

disputes from, and sent ██████████ to, ██████ consumers nationwide, and ██████ consumers

in New York. (ECF No. 42-19 SEALED ("Def's Suppl. Resps. to Interrog. Nos. 1 and 8") at 3;

Leslie Depo. Tr. at 42:12–18, 48:4–8); Pl's Mem. at 11). Further, while ███████████████████

██████████████████████████████████████████████████████

███████████ (Gobin Decl. ¶ 22), the agency has identified records indicating that, for ████████

of the New York consumers, Equifax delivered some information about the consumer to a third

party after it had received a hard inquiry dispute from the consumer. (ECF No. 42-35 SEALED

("Def's Suppl. Resp. to Pl's Interrog. No. 6") at 2; Leslie Depo. Tr. at 47:3, 59:9–19, 64:1–15,

82:14–83:3). These records—internally known as "Log F" or "MDB records"—contain a

"snapshot" of the consumer's credit file at the time that a product containing information about

that consumer was delivered to an Equifax customer. (Leslie Depo. Tr. at 17:19–24, 19:19–25,

20:3–6). These ██████ consumers' files contained a combined ██████ disputed hard inquiries. (Pl's

Mem. at 8 n.5 (citing Leslie Depo. Tr. at 59:17–61:3); *see also* Def's Suppl. Resp. to Pl's Interrog.

No. 6 at 2). However, some Equifax products contain only a subset of the information included on

a consumer's full credit file, and because of the nature of Equifax's record keeping practices, the

agency cannot specifically determine whether the products sold regarding these ██████ individuals

included a disputed hard inquiry or contained disputed information. (Def's Opp. at 20 n.12; Def's Suppl. Resp. to Pl's Interrog. No. 6 at 3; Leslie Depo. Tr. at 67:19–69:1, 82:14–83:24).

Equifax has also produced letters from ███████████████ consumers disputing hard inquiry information, approximately ███████████ contain the phrase "Capital One." (ECF No. 42-21 SEALED ("Sartell Decl." ¶¶ 3–5). In addition to these letters, Equifax has reproduced ███████████ similar letters containing disputes of hard inquiries which were provided to the named plaintiffs in a substantially similar class action currently pending in the Northern District of Georgia, *Rivera v. Equifax Info. Servs., LLC*, No. 1:18-CV-4639 (AT) (CCB) (the "*Rivera* Action"). (*See* ECF No. 42-26 SEALED ("Pritchard Decl.") ¶ 2). Among the ███████████ total letters produced in both actions, Equifax has identified ██ "exemplars" which it argues ████████████████████████ ██████████ and ████████████████████████████████ ██████████ rather than directly from the consumers themselves. (*Id.* ¶ 2; *see also* ECF Nos. 42-27–42-31 SEALED ("Def's Exemplar Dispute Letters")).

IV.  Procedural History

Plaintiff filed his class action complaint on November 27, 2019. (Compl.). Early in the case, the parties agreed to bifurcate the proceedings, such that "[a]ny dispositive motion practice may be filed only after the court's ruling on class certification." (ECF No. 22 ¶ 11). After a number of discovery disputes, court interventions, and concomitant deadline extensions (ECF Nos. 26–28, 30–35, Minute Entry dated 12/03/2020; Orders dated 01/26/2021, 02/04/2021, 03/18/2021, 04/12/2021), Plaintiff filed the motion for class certification on January 26, 2022. (*See* ECF No. 43–46). Your Honor referred the motion to me on March 22, 2022. (Order dated 03/22/2022). Shortly after the motion was referred, Plaintiff filed a notice directing the Court's attention to an

order recently issued in the *Rivera* Action, which certified a nationwide class that overlaps with the nationwide FCRA class sought in this case. (ECF No. 47); *Rivera v. Equifax Info. Servs., LLC*, No. 1:18-CV-4639 (AT) (CCB), 2022 WL 986443, at *5 (N.D. Ga. Mar. 30, 2022).

## V.  Proposed Nationwide Class and Subclasses

Plaintiff seeks to certify one nationwide class and three claim-based subclasses. With respect to his "reinvestigation claims" under 15 U.S.C. § 1681i, Plaintiff seeks to certify a nationwide "FCRA Class," defined as:

> During the period beginning two years prior to the filing of this action and through the time of final judgment, all consumers with an address in the U.S. and its Territories to whom Equifax sent a document containing ██████████ (*i.e.*, a letter that includes the language, "inquiries are a factual record of file access" in response to a written dispute of one or more hard inquiries.

(Pl's Mem. at 3).[3] Plaintiff also seeks to certify three claim-based subclasses: a "New York Subclass" with respect to claims under the NYFCRA, N.Y. Gen. Bus. Law §§ 380 *et seq*.:

> During the period beginning two years prior to the filing of this action and through the time of final judgment, all consumers with an address in the State of New York to whom Equifax sent a document containing ██████████ (i.e., a letter that includes the language, "inquiries are a factual record of file access" in response to a written dispute of one or more hard inquiries).

(*Id.*); a "Capital One Subclass" with respect to "unreasonable procedures" and "permissible purpose" claims under 15 U.S.C. § 1681e(a):

---

[3] As noted above, a similar and overlapping nationwide class definition was proposed and recently certified in the *Rivera* action. *See Rivera v. Equifax Info. Servs., LLC*, No. 1:18-CV-4639-AT-CCB, 2022 WL 986443, at *5 (N.D. Ga. Mar. 30, 2022) ("During the period beginning two years prior to the filing of this action [on October 4, 2018] and *through the time of class notice,* all persons residing in the U.S. and its Territories to whom Equifax sent a document containing ██████████ (i.e., a statement that 'inquiries are a factual record of file access') in response to a written dispute of one or more hard inquiries.") (emphasis added), *leave to appeal denied*, (11th Cir. June 14, 2022). This definition is substantially identical to the class definition that was certified in a similar case against TransUnion in the Eastern District of Pennsylvania. *See Norman v. TransUnion, LLC*, 479 F. Supp. 3d 98 (E.D. Pa. 2020), *leave to appeal denied*, 2020 WL 6393900 (3d Cir. Sept. 15, 2020).

As a result of the overlapping class definitions, Hines is a member of the nationwide class certified in the *Rivera* action. Notably, the *Rivera* plaintiffs are also represented by Hines' attorneys. (*See* ECF No. 27 at 2 n.2 ("Counsel for Plaintiff and Defendant in this matter and the *Rivera* matter are the same.").

> During the period beginning two years prior to the filing of this action and through the time of final judgment, all consumers with an address in the U.S. and its Territories (1) to whom Equifax sent a document containing ███████████ (i.e., a letter that includes the language, "inquiries are a factual record of file access" in response to a written dispute of one or more hard inquiries), which (2) corresponds to the consumer's dispute of a hard inquiry associated with Capital One.

(*Id.*); and a "Post-Dispute Publication Subclass" with respect to "improper furnishing" claims under 15 U.S.C. § 1681b(c)(3):

> During the period beginning two years prior to the filing of this action and through the time of final judgment, all consumers with an address in the U.S. and its Territories (1) to whom Equifax sent correspondence containing ████████ (i.e., a letter that includes the language, "inquiries are a factual record of file access" in response to a written dispute of one or more hard inquiries) and (2) about whom Equifax has a "MDB record" (e.g., a "Log F" or "Frozen Scan") that postdates the ████████ correspondence and contains the disputed hard inquiry.

(*Id.* at 4).[4]

## **DISCUSSION**

I.    Standing

As a threshold matter, the Court must determine whether Hines has standing to pursue his claims on his own behalf and on behalf of absent class members. Equifax argues that a class may not be certified because Hines has not demonstrated that absent class members have standing. (Def's Opp. at 11–12). Specifically, it argues that "Hines has not identified any concrete harms suffered by the class members beyond alleged technical violations of the FCRA and the NYFCRA, let alone that he could prove any such harms with common evidence." (*Id.* at 12). For the reasons explained below, Hines has standing to pursue damages on his own behalf and on behalf of absent class members for each claim.

---

[4] The classes sought in Plaintiff's motion are different from those described in the complaint. (*Compare* Compl. ¶¶ 51–53 *with* ECF No. 43-2 ("Proposed Order") at 1–2).

A. <u>Standing in the Class Action Context</u>

Article III standing is a "threshold question in every federal case" that "determine[s] the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." *Mahon v. Ticor Title Ins. Co*., 683 F.3d 59, 62 (2d Cir. 2012) (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.,* 433 F.3d 181, 198 (2d Cir. 2005)). In the class action context in particular, "[s]tanding to sue is an essential threshold which must be crossed before any determination as to class representation under Rule 23 can be made. Without standing, one cannot represent a class[.]" *Cassese v. Washington Mut., Inc.*, 262 F.R.D. 179, 183 (E.D.N.Y. 2009) (quoting *Weiner v. Bank of King of Prussia,* 358 F. Supp. 684, 694 (E.D. Pa. 1973)). Contrary to Equifax's position, courts in the class action context focus on the class representative's standing, rather than that of the absent class members. "To establish Article III standing in a class action for every named defendant there must be *at least one named plaintiff* who can assert a claim directly against that defendant, and at that point standing is satisfied and only then will the inquiry shift to a class action analysis." *NECA -IBEW Health & Welfare Fund v. Goldman Sachs & Co*., 693 F.3d 145, 159 (2d Cir. 2012) (alterations omitted) (emphasis added) (quoting *Cent. States*, 504 F.3d at 241).

Where a class opponent challenges a named plaintiff's standing to bring claims on behalf of absent class members, courts engage in a "bifurcated inquiry." *Gold v. Eva Nats., Inc.*, No. 21-CV-2842 (GRB) (AYS), 2022 WL 566230, at *1 (E.D.N.Y. Feb. 16, 2022) (quoting *Petrosino v. Stearn's Prod., Inc*., No. 16 Civ. 7735 (NSR), 2018 WL 1614349, at *5 (S.D.N.Y. Mar. 30, 2018). "First, the representative plaintiff must establish that she has Article III standing. . . . Second, the plaintiff must establish that she has 'class standing.'" *Gold*, 2022 WL 566230, at *1. This requires

13

that the plaintiff show "(1) that he 'personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant,' and (2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (alteration in original) (first quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982), then quoting *Gratz v. Bollinger*, 539 U.S. 244, 267 (2003)).

While Equifax's assertion that plaintiff's failure to demonstrate absent class members' standing precludes class certification is incorrect, its objection underscores the importance of the Court's "independent obligation to assure that standing exists." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Accordingly, I will examine whether Hines has demonstrated Article III standing on each of his claims and for each form of relief sought, and whether he has satisfied the *NECA-IBEW* test for class standing.

B.  Hines Has Article III Standing to Pursue Monetary Relief

1.  Article III Standing — Legal Standard

To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Ramirez*, 141 S. Ct. at 2203 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561; *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990), *holding modified by City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004)

14

("It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record. And it is the burden of the party who seeks the exercise of jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.") (internal quotation marks and citations omitted). "At the class certification stage, a named plaintiff must prove standing by a preponderance of the evidence." *Pryce v. Progressive Corp.*, No. 19-CV-1467 (RJD) (RER), 2022 WL 1085489, at *13 (E.D.N.Y. Feb. 17, 2022) (citing *Calvo v. City of New York*, No. 14 Civ. 7246 (VEC), 2017 WL 4231431, at *3 (S.D.N.Y. Sept. 21, 2017)), *adopted as modified by* 2022 WL 969740 (Mar. 31, 2022); *see also Giammatteo v. Newton*, 452 F. App'x 24, 27 (2d Cir. 2011) ("A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that jurisdiction exists.") (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)). "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Ramirez*, 141 S. Ct. at 2208 (citing *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008); *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.,* 528 U.S. 167, 185 (2000)). "[W]hen evaluating standing, courts 'must assume that the party asserting federal jurisdiction is correct on the legal merits of his claim, that a decision on the merits would be favorable and that the requested relief would be granted.'" *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, No. 05-MD-1720 (MKB) (JO), 2019 WL 7584728, at *14 (E.D.N.Y. Nov. 20, 2019) (quoting *Cutler v. U.S. Dep't of Health & Human Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015)).

With respect to the injury-in-fact requirement, the Supreme Court has recently emphasized in cases involving the FCRA that "[o]nly those plaintiffs who have been *concretely harmed* by a

defendant's statutory violation may sue that private defendant over that violation in federal court," *Ramirez*, 141 S. Ct. at 2205 (emphasis in original), and that a plaintiff "cannot satisfy the demands of Article III by alleging a bare procedural violation," since "[a] violation of one of the [statute's] procedural requirements may result in no harm." *Spokeo*, 578 U.S. at 342. Accordingly, where Congress has created "a statutory prohibition or obligation and a cause of action," as it has in the case of the FCRA, a Court must "independently decide whether a plaintiff has suffered a concrete harm under Article III." *Ramirez*, 141 S. Ct. at 2205. This may be a "traditional tangible harm" such as physical or monetary damage, or an "intangible harm" that bears "a close relationship to harms traditionally recognized as providing a basis for lawsuits," such as reputational damage, the disclosure of private information, or intrusion upon seclusion. *Id.* at 2204.

In *Ramirez*, a class representative brought suit under the FCRA on behalf of more than eight thousand consumers who had been flagged by TransUnion as potential matches to individuals identified on a list of terrorists and serious criminals maintained by the Treasury Department, based solely on their shared names. *Id.* at 2201–02. The class representative alleged that the agency failed to use reasonable procedures as required by § 1681e(b) to assure that class members' credit reports would not inaccurately label them as potential criminals, and failed to adhere to specific requirements under the Act when providing those consumers with a copy of their credit file that confirmed the error. *Id.* at 2207. Of the eight thousand-plus class members, "the parties stipulated that TransUnion did not provide [more than six thousand class members'] credit information to any potential creditors during the class period." *Id.* at 2209.

The *Ramirez* Court held that, for the minority of class members whose credit reports were shared, the dissemination of a credit report bearing misleading information to a third party constituted an injury in fact under Article III because the harm exacted by the publication of such

misleading statements "bears a sufficiently close relationship to the harm from a false and defamatory statement." *Id.* at 2209. However, likening inaccurate but undisclosed notations of a potential terrorist match on a consumer's credit file to a "defamatory letter . . . stored . . . in [a] desk drawer," the Court determined that "[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *Id.* at 2210. Accordingly, the Court found that the remaining majority of class members whose files were not disseminated lacked standing to sue for damages on the reasonable procedures claim. *Id.* The Court also found that the risk of future harm, without some demonstration that exposure to such risk caused an independent harm (such as emotional or psychological distress), or that the harm itself materialized, is insufficient to confer standing to pursue retrospective damages. *See id.* at 2211–13. With respect to the remaining claims, the Court held that TransUnion's conduct—mailing one copy of the consumer credit file upon request that omitted the alert, and mailing a second, corrected copy to the consumer without attaching a statutorily required summary-of-rights—caused no traditionally recognized harm to any class members, such as confusion, distress, or reliance on the improperly formatted information, such that plaintiffs demonstrated only "'bare procedural violations, divorced from any concrete harm.' . . . [t]hat [did] not suffice for Article III standing." *Id.* at 2213 (quoting *Spokeo*, 578 U.S. at 341).

In interpreting *Ramirez*, the Second Circuit has reiterated that "plaintiffs must show that the statutory violation caused them a concrete harm, regardless of whether the statutory rights violated were substantive or procedural." *Maddox v. Bank of New York Mellon Tr. Co., N.A.*, 19 F.4th 58, 64 n.2 (2d Cir. 2021). Accordingly, courts in this District have held in FCRA cases that "[w]here a plaintiff claims that an improper notation on his credit report resulted in a credit score reduction that could cause him reputational and financial harm, the absence of allegations of dissemination

to third parties requires dismissal" for lack of standing. *Zlotnick v. Equifax Info. Servs., LLC*, No. 21-CV-7089 (GRB) (JMW), 2022 WL 351996, at *3 (E.D.N.Y. Feb. 3, 2022) (citing *Grauman v. Equifax Informational Services, LLC,* 549 F. Supp. 3d 285, 291–92 (E.D.N.Y. July 16, 2021); *Cohen v. Experian Information Solutions, Inc.*, No. 20-CV-3678 (BMC), 2021 WL 413494, at *2 (E.D.N.Y. Feb. 4, 2021)).

    2.  <u>Reinvestigation Claims</u>

    With respect to his reinvestigation claims under § 1681i and its New York analogue, Hines contends that Equifax fails to reinvestigate consumer disputes regarding unauthorized inquiries as a matter of course, and that their failure to do so results in "lost time and money submitting a doomed dispute, the deprivation of the results of a reasonable reinvestigation, and the diminution of [his] credit score[.]" (Pl's Reply at 2). Hines' argument that a plaintiff's loss of the "benefit of the reasonable reinvestigation into the accuracy of her credit report to which he was statutorily entitled [was] an actual, concrete injury which is particularized to Plaintiff" (*Id.* (quoting *Jones v. Experian Info. Sols., Inc.*, 982 F. Supp. 2d 268, 272 (S.D.N.Y. 2013)) is unavailing in light of *Spokeo* and *Ramirez*, which caution that an agency's failure to adhere to the procedural obligations imposed by the FCRA is, in and of itself, insufficient to establish an injury in fact. *See Spokeo*, 578 U.S. at 342; *Ramirez*, 141 S. Ct. at 2213.

    However, courts in other circuits "have routinely found that wasted time resulting from a defendant's FCRA violation is a sufficiently concrete and particularized injury to establish standing." *Healy v. Milliman, Inc.*, No. C20-1473 (JCC), 2022 WL 1061921, at *3 (W.D. Wash. Apr. 8, 2022) (citing *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021); *Nelson v. Experian Info. Sols., Inc.*, 21-CV-894 (CLM), 2022 WL 193010, at *2–3 (N.D. Ala. Jan. 10, 2022)). For example, in *Nelson*, a court in the Northern District of Alabama found that the lost

time and money spent sending successive dispute letters to an agency that unlawfully failed to conduct a reasonable reinvestigation after an initial request constituted an injury in fact sufficient to confer standing. *Nelson*, 2022 WL 193010, at *3. Here, Hines has similarly demonstrated that he made multiple futile attempts via the CFPB portal and via certified mail to dispute and obtain a reasonable reinvestigation of the unauthorized inquiry. (*See, e.g.*, Hines Depo. Exhibits 2–37; Pl's Resps. to Def's First Interrogs. at 9–10). This wasted time and expense is a traditional monetary harm that is fairly traceable to Equifax's policy of summarily categorizing and handling such disputes without a thorough investigation and without contacting the creditor responsible for the inquiry (Gobin Decl. ¶ 9; Gobin Depo. Tr. at 29:5–22), and is redressable by judicial relief.

Further, although without dissemination "neither an incorrect notation on plaintiff's credit report nor the diminution in his credit score are sufficient to confer standing," *Zlotnick*, 2022 WL 351996 at *3; *cf. Shimon v. Equifax Info. Servs. LLC*, 431 F. Supp. 3d 115, 122 (E.D.N.Y. 2020) (dismissing reinvestigation claims under § 1681i on the merits where disputed information was disseminated but was ultimately confirmed to be accurate), *aff'd*, 994 F.3d 88 (2d Cir. 2021), Hines' Capital One Inquiry was, in fact, shared with at least one third party creditor in June 2019— after it was disputed but before it was removed from his credit file. (*See* Hines Depo. Tr. at 14:17– 16:10; Leslie Depo. Tr. at 50:13–51:3, 57:7–58:7).[5] As recognized in *Ramirez* and its progeny, sharing inaccurate or misleading information about a consumer may cause traditionally recognized reputational harm that is actionable at law. *See, e.g.*, *Ramirez*, 141 S. Ct. at 2209; *Maddox*, 19 F.4th at 65; *Grauman*, 549 F. Supp. 3d at 291–92. Assuming that Hines is correct on the merits of his claim, *see Barry's Cut Rate Stores*, 2019 WL 7584728, at *14, such harm would not have occurred

---

[5] Although the nature of Equifax's products and record-keeping practices preclude a finding with certainty at this time that the Capital One Inquiry was, in fact, shared with any third-party creditors, the Court finds that the post-dispute inquiries by Synchrony Bank evidenced by MDB records generated after he disputed the inquiry are sufficient to demonstrate by a preponderance of the evidence that such a harm likely occurred.

had Equifax performed a reasonable reinvestigation into the inquiry pursuant to its statutory obligations. Accordingly, Hines has sufficiently demonstrated a second concrete harm that is fairly traceable to Equifax's alleged violations of § 1681i and N.Y. Gen. Bus. Law § 380-f, which is sufficient to confer Article III standing to pursue damages.

3. <u>Reasonable Procedures and Permissible Purpose Claims</u>

In connection with his § 1681e(a) and related state claims, Hines alleges that Equifax failed to adopt reasonable procedures to assure that consumer information is furnished only for the permissible purposes defined on the exhaustive list in § 1681b of the statute. Specifically, he alleges that, because the Capital One Inquiry represents an inquiry made in connection with a transaction that he did not initiate, disclosure of the inquiry was prohibited by the "permissible purpose" provision of § 1681b(c)(3). Further, he argues that the high volume of disputes regarding inquiries by Capital One should have put Equifax on notice that the bank was routinely acquiring reports for impermissible purposes. (Pl's Reply at 10). In his complaint, he alleges that "Equifax's procedures are clearly broken," as "[t]hey fail to limit the disclosure of sensitive personal and financial information about millions of consumers to FCRA and NYFCRA permissible purposes and fail to reign [sic] in repeat offenders who illegally obtain sensitive personal and financial consumer information without authorization." (Compl. ¶ 29). Although not specifically articulated by Plaintiff, the injuries caused by violations of these provisions bear a close relationship to two of the "traditionally recognized" harms identified by the *Ramirez* Court: "reputational harm" and "intrusion on seclusion." *Ramirez*, 141 S. Ct. at 2204 (citing *Meese v. Keene*, 481 U.S. 465, 473 (1987); *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020)).

Because New York does not recognize a common-law right to privacy, courts sitting in this District look to traditional tort concepts and to the Restatement of Torts to carry out the historical

common law analysis contemplated by *Spokeo* and *Ramirez*. *See, e.g.*, *Devitt v. Portfolio Recovery Assocs., LLC*, No. 21-CV-5657 (ARR) (ARL), 2022 WL 1460278, at *6 (E.D.N.Y. May 9, 2022). The Restatement recognizes as a "general principle" that "one who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other." Restatement (Second) of Torts § 652A. "The traditional tort comprises four separate privacy causes of action: public disclosure of private facts, false light, intrusion upon seclusion, and appropriation of likeness." *Devitt*, 2022 WL 1460278, at *6. (quoting Restatement (Second) of Torts § 652A. Under the Restatement, a defendant may be liable for intrusion on seclusion where he "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B. Such intrusion "may be by some . . . form of investigation or examination into his private concerns," and it is "[t]he intrusion itself [that] makes the defendant subject to liability, even though there is no publication or other use of any kind of the . . . information outlined." *Id.* cmt. b. "The defendant is subject to liability under the rule . . . only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs." *Id.* cmt. c. In line with these common law principles, the Supreme Court has recognized that "both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763–64 (1989).

Legislative history indicates that the FCRA was adopted to vindicate these general rights to privacy, and to protect the public from harms similar to those redressable by common law claims for intrusion on seclusion. According to the "[c]ongressional findings and statement of purpose"

section of the FCRA, the Act was in part adopted "to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a *respect for the consumer's right to privacy*." 15 U.S.C. § 1681(a)(4) (emphasis added). Courts across the country have therefore interpreted the FCRA in general, and the permissible purposes section in particular, as protecting the public from intrusions upon seclusion and from invasions upon the right to privacy. *See, e.g.*, *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 489–93 (9th Cir. 2019) (comparing the harm attending a violation of the permissible purposes section of the FCRA as "closely related to—if not the same as—a harm that had traditionally been regarded as providing a basis for a lawsuit: intrusion upon seclusion."); *Browner v. Am. Eagle Bank*, 355 F. Supp. 3d 731, 737 (N.D. Ill. 2019) ("The claim here is . . . simple[]: unauthorized access for no permissible purpose. The clear intent of Congress to preclude such access, taken in connection with the long legal history of protecting the privacy of confidential information, makes clear that the complaint alleges enough to carry the plaintiff's burden of alleging standing, including injury in fact."); *Gambles v. Sterling Infosystems, Inc.*, 234 F. Supp. 3d 510, 522 (S.D.N.Y. 2017) (finding standing under FCRA and noting that "it has long been the case that an unauthorized dissemination of one's personal information, even without a showing of actual damages, is an invasion of one's privacy that constitutes a concrete injury sufficient to confer standing to sue.") (quoting *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 636 (E.D. Va. 2016)); *Gillison v. Lead Express, Inc.*, No. 3:16-CV-41, 2017 WL 1197821, at *5 (E.D. Va. Mar. 30, 2017) (denying motion to dismiss permissible purpose claims for lack of standing, noting that "not only has Congress defined the invasion of one's privacy as an injury in fact, but courts traditionally have recognized statutory violations rooted in privacy invasions as a basis for suit").

Section 1681b of the FCRA in particular illustrates Congress' judgment that the collection and dissemination of certain personal information for certain purposes violates a consumer's right to privacy. As relevant here, Section 1681b(c)(3) prohibits a credit reporting agency from furnishing "to any person a record of inquiries in connection with a credit or insurance transaction that is not initiated by a consumer." 15 U.S.C. § 1681b(c)(3). This section implicitly acknowledges some limitations on the right to privacy by permitting agencies to collect and disclose certain personal information for specified purposes, but ensures that when an agency permissibly intrudes upon a consumer's seclusion by disclosing his personal information in response to an unsolicited request, additional damage to the consumer's privacy and reputational interests is not done by disseminating a record of that intrusion to other third parties. In tandem, Section 1681b and Section 1681e(a) mandate that agencies adopt reasonable procedures to prevent such disclosures; define as a matter of public policy the scope of an individual's right to privacy to credit-related information; and, with Sections 1681n and 1681*o*, make actionable any willful and negligent invasions upon that right which bear a close relationship to harms traditionally recognized at common law.

Here, Hines reportedly opted out of receiving prescreened offers of credit with the expectation that doing so would prevent his personal information from being disseminated without his authorization. (Hines Depo. Tr. at 32:17–23). Voicing his preference to be free from unsolicited offers of credit can be viewed as an attempt to "throw [a private seclusion] about his affairs," and Equifax's initial unauthorized disclosure of his information, if considered "highly offensive," could itself be an actionable intrusion at common law. Restatement (Second) of Torts § 652B cmt. c. Even if Equifax's initial intrusion upon Hines' seclusion in disclosing his information in connection with a transaction that he did not initiate was permissible, reporting the inquiry

23

constitutes a second, impermissible intrusion and allegedly caused reputational harm. *See* Hines Depo. Tr. at 14:17–16:10; Leslie Depo. Tr. at 50:13–51:3, 57:7–58:7). At this stage, Hines has sufficiently demonstrated a likelihood that Equifax's failure to adopt reasonable procedures to prevent the furnishing of the Capital One Inquiry resulted in invasions upon his right to privacy and caused reputational harm. Both harms bear a sufficient relationship to harms traditionally recognized at common law, such that he has Article III standing to pursue damages on his § 1681e(a) and § 1681b claims.

### 4. Post-Dispute Publication Claims

With respect to his Post-Dispute Publication claims under § 1681b(c), Hines argues that the distribution of disputed hard inquiry information to creditors caused reputational injuries sufficient to confer standing independently. (Pl's Reply at 3). As noted above, Hines alleges, and Equifax has confirmed, that his credit information was disseminated to at least one third party in June 2019, after the Capital One Inquiry was disputed but before it was removed from his credit file. *See* Hines Depo. Tr. at 14:17–16:10; Leslie Depo. Tr. at 50:13–51:3, 57:7–58:7). The reputational harm that results from the disclosure of inaccurate or misleading credit information to third parties, as alleged here, has clearly been recognized as sufficient to confer standing. *See, e.g.*, *Ramirez*, 141 S. Ct. at 2210; *Grauman*, 549 F. Supp. 3d at 292. Such harms are fairly traceable to Equifax's conduct and are redressable by monetary relief. Hines has therefore sufficiently demonstrated standing to pursue his § 1681b(c) claims.

### 5. Injunctive and Declaratory Relief

"[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek[.]" *Ramirez*, 141 S. Ct. at 2208. Accordingly, Hines must independently demonstrate Article III standing to obtain injunctive and declaratory relief. (*See* Compl. at 16–17

(seeking orders declaring that Defendant's actions are in violation of the FCRA and NYFCRA and orders enjoining Equifax to comply with the relevant provisions of the NYFCRA)).

"Although past injuries may provide a basis to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." *Pryce*, 2022 WL 1085489, at *7 (quoting *Nicosia v. Amazon.com, Inc*., 834 F.3d 220, 239 (2d Cir. 2016)); *see also Pres. at Connetquot Homeowners Ass'n, Inc. v. Costco Wholesale Corp*., No. 17-CV-7050 (JFB) (AYS), 2019 WL 337093, at *5 (E.D.N.Y. Jan. 28, 2019) ("When standing is premised on the threat of repeated injury, a plaintiff must show 'a sufficient likelihood that it will be wronged in a similar way.'") (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111–12 (1982)); *Barry's Cut Rate Stores Inc.*, 2019 WL 7584728, at *19 (E.D.N.Y. Nov. 20, 2019) ("In seeking prospective relief like an injunction, 'a plaintiff must show that he can reasonably expect to encounter the same injury again in the future—otherwise there is no remedial benefit that he can derive from such judicial decree.'") (quoting *Leder v. Am. Traffic Sols., Inc*., 81 F. Supp. 3d 211, 222 (E.D.N.Y. 2015), *aff'd*, 630 F. App'x 61 (2d Cir. 2015)); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 800 (2d Cir. 2015) ("The Supreme Court has 'repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient.'" (emphasis in original) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)).

Setting aside his concession that "[i]t is less than clear that injunctive relief is available under the FCRA,"[6] Plaintiff argues injunctive relief is appropriate under the NYFCRA "because Equifax

---

[6] Equifax argues that injunctive relief is not expressly authorized by either the FCRA or the NYFCRA, and is therefore unavailable. (Def's Opp. at 24). While it is well-settled that "injunctive relief is unavailable in suits brought by private parties" under the FCRA, *Grauman*, 549 F. Supp. 3d at 292 n.4 (citing *Ramirez*, 141 S. Ct. at 2197; *George v. Equifax Mortg. Servs*., No. 06-CV-971 (DLI) (LB), 2010 WL 3937308, at *3 (E.D.N.Y. Oct. 5, 2010); *White v. First Am. Registry, Inc*., 378 F. Supp. 2d 419, 424 (S.D.N.Y. 2005)); *see also Owoyemi v. Credit Corp Sols. Inc*., No. 21 Civ. 8021 (GHW) (RWL), 2022 WL 993011, at *4 (S.D.N.Y. Mar. 31, 2022) ("The FCRA . . . does not provide for injunctive relief to consumers."), the availability of injunctive relief under the NYFCRA is less clear, *compare*

engaged in a standardized, common course of conduct," (Pl's Mem. at 18) and because the agency "has not changed its uniform policy concerning disputes of hard inquiry information." (Pl's Reply at 3). However, "'the existence of an official policy, on its own, is not sufficient to confer standing to sue for injunctive and declaratory relief on any individual who had previously been subjected to that policy,' unless the individual can also show a sufficient likelihood of future harm." *Dorce v. City of New York*, 2 F.4th 82, 95 (2d Cir. 2021) (quoting *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004) (alterations omitted)). While Hines has alleged past injuries, and alleges that Equifax continues to willfully violate the requirements outlined by FCRA and NYFCRA (Compl ¶¶ 46–49), he has neither alleged nor demonstrated any facts that suggest he is personally subject to ongoing harm or is likely to suffer the same harm again in the future if injunctive relief is not granted. The theoretical possibility that Equifax's improper reinvestigation practices will be applied to Hines detriment again at some unknown point in the future is insufficient to give him standing to sue for injunctive relief.[7]

Plaintiff similarly has not established standing to pursue declaratory relief. Under the Declaratory Judgment Act: "[i]n a case of actual controversy within its jurisdiction . . . any court

---

*Owoyemi*, 2022 WL 993011, at *6 (dismissing claim for injunctive relief with prejudice because such relief "is not available under either the FCRA or the NYFCRA") *and Sloan v. TransUnion, LLC*, No. 21-CV-769 (MAD) (ML), 2022 WL 2237639, at *3 (N.D.N.Y. June 16, 2022) (denying default judgment seeking injunctive relief pursuant to the FCRA and NYFCRA) *with White*, 378 F. Supp. 2d at 425 (noting that "while the NYFCRA expressly authorizes monetary damages, the absence of any mention of injunctive relief or an affirmative grant of power to seek injunctive relief does not necessarily and inescapably lead to the conclusion that the Legislature meant to preclude such relief for private plaintiffs"). Because there are independent grounds for denying injunctive relief, the Court need not determine whether such relief is available under the NYFCRA at this time.

[7] Equifax also notes that the injunctive relief Plaintiff seeks would impermissibly amount to an order that Equifax "obey the law." (Def's Opp. at 24). Plaintiff responds that a more detailed injunctive order would be available upon further merits discovery and is unnecessary at this time. (Pl's Reply 14). On this score, Plaintiff is correct. While Equifax is correct that an "obey the law" order similar to that described in the generalized prayer for relief of Hines' complaint would be invalid, *see S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001), should Hines prevail on the merits and should the Court find that he is entitled to injunctive relief, he would "have the opportunity to submit a proposed order of injunction for the Court's review." *See, e.g., Kaganovich v. McDonough*, 547 F. Supp. 3d 248, 279 (E.D.N.Y. 2021) (citing *Equal Emp. Opportunity Comm'n v. AZ Metro Distributors, LLC*, No. 15-CV-5370 (ENV) (PK), No. 15-CV-5370 (ENV) (PK), 2020 WL 7404432, at *14 (E.D.N.Y. Dec. 16, 2020)).

of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. "A court will generally decline to exercise its discretion to entertain a request for declaratory relief where such relief would serve 'no useful purpose.'" *Pryce*, 2022 WL 1085489, at *8 (quoting *Intellectual Capital Partner v. Inst. Credit Partners LLC*, No. 08 Civ. 10580, 2009 WL 1974392, at *6 (S.D.N.Y. July 8, 2009). "Declaratory relief serves 'no useful purpose' where 'legal issues will be resolved by litigation' of the underlying claims." *Id.* (quoting *Intellectual Capital Partner*, 2009 WL 1974392, at *6); *see also Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC*, No. 16-CV-6370 (SJF) (AYS), 2017 WL 6729854, at *12 (E.D.N.Y. Oct. 31, 2017), *aff'd* 736 F. App'x 274 (2d Cir. 2018) (same).

Here, Plaintiff seeks "[a]n order declaring that Defendant's actions are in violation of the FCRA" and "[a]n order declaring that Defendant's Actions are in violation of the NYFCRA." (Compl. at 16). The legal issues implicated by these requests will be resolved through litigation on the underlying claims, such that declaratory relief is unnecessary. Further, relief under the Declaratory Judgment Act is "intended to operate prospectively." *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 255 (E.D.N.Y. 2021) (quoting *Storms v. United States*, No. 13-CV-811 (MKB), 2015 WL 1196592, at *21 (E.D.N.Y. Mar. 16, 2015)). As noted above, Plaintiff has not alleged or established that Equifax's policy will likely be enforced against him again in the future such that prospective relief is appropriate.

Given the adequacy of remedies at law and Plaintiff's failure to allege prospective harm, the Court finds that Plaintiff has not established standing to seek injunctive or declaratory relief.

C. Hines Has Class Standing

A named plaintiff in a putative class action has "class standing" to pursue claims on behalf of absent class members "if he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW*, 693 F.3d at 162 (internal quotation marks and citations omitted). "When this standard is satisfied, the named plaintiff's litigation incentives are sufficiently aligned with those of the absent class members that the named plaintiff may properly assert claims on their behalf." *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon,* 775 F.3d 154, 161 (2d Cir. 2014).

The application of the *NECA-IBEW* test is straightforward here. As explained above, Hines has adequately demonstrated that he has personally suffered actual injuries as a result of Equifax's putatively illegal conduct; namely, Hines lost time and money in pursing doomed disputes of unauthorized hard inquiries, and suffered harms to his privacy and reputational interests as a result of Equifax's failure to adopt reasonable procedures to prevent the disclosure of personal information for impermissible purposes. Equifax's uniform conduct with respect to disputes of unauthorized inquiries is alleged to have caused the same injuries to absent class members and implicates the same set of concerns. Thus, Hines' litigation incentives are sufficiently aligned with the absent class members, and he may pursue claims on their behalf.

II. Personal Jurisdiction

As a second threshold issue, the Court must determine whether it has personal jurisdiction over the defendant and over out-of-state claims. Equifax correctly notes that the Court lacks general personal jurisdiction to adjudicate claims brought against it, since Equifax is a Georgia LLC with

a principal place of business in Georgia, and therefore is not "at home" in New York. (*See* Def's Opp. at 25); *see also Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). Equifax also argues that the Court lacks specific personal jurisdiction to hear the claims of putative class members that arose outside of New York, because they lack a sufficient connection to the forum. (Def's Opp. at 25 (citing *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773, 1780–81 (2017)). I disagree.

In *Bristol-Myers*, the Supreme Court held that a California court lacked specific personal jurisdiction over non-California residents' mass tort claims in a consolidated products liability action because the conduct giving rise to their claims did not occur in the state. *Bristol-Myers*, 137 S. Ct. at 1781–82. However, that case "involved a state-court consolidated mass action, not a class action in federal court," *Cox v. Spirit Airlines, Inc.*, No. 17-CV-5172(EK) (VMS), 2022 WL 939732, at *18 (E.D.N.Y. Mar. 29, 2022), and thus was more limited in its holding than Equifax argues. Indeed, both the majority and the dissenting opinions explicitly acknowledged the limited nature of the Court's ruling. *See Bristol-Myers*, 137 S. Ct. at 1783–84 ("[S]ince our decision concerns the due process limits on the exercise of specific jurisdiction by a State, we leave open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court."); *see also id.* at 1789 n.4 (Sotomayor, J., dissenting) ("The Court today does not confront the question whether its opinion here would also apply to a class action in which a plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of whom were injured there.").

"In the wake of the *Bristol-Myers* decision, lower federal courts have split on whether its rationale applies to federal nationwide class action under Rule 23 of the Federal Rules of Civil Procedure." *Mason v. Lumber Liquidators, Inc.*, No. 17-CV-4780 (MKB), 2019 WL 2088609, at

*5 (E.D.N.Y. May 13, 2019), *adopted by* 2019 WL 3940846 (Aug. 19, 2019) (collecting cases). Only two circuit courts have directly addressed the applicability of *Bristol-Myers* to federal class actions—both held that it does not apply. *See Mussat v. IQVIA, Inc.*, 953 F.3d 441, 447 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1126 (2021); *Lyngaas v. Ag*, 992 F.3d 412, 435 (6th Cir. 2021).

In *Mussat*, the Seventh Circuit explained that "absent class members are not full parties to the case for many purposes," such as determining whether diversity jurisdiction exists or whether venue is proper, and found "no reason why personal jurisdiction should be treated any differently from subject-matter jurisdiction and venue: the named representatives must be able to demonstrate either general or specific personal jurisdiction, but the unnamed class members are not required to do so." *Mussat*, 953 F.3d at 447; *see also Devlin v. Scardelletti,* 536 U.S. 1, 9–10 (2002) ("Nonnamed class members . . . may be parties for some purposes and not for others."). The court also noted that the superiority requirement of Rule 23(b)(3) and its corresponding committee notes advise courts considering whether to certify a class to consider "'the desirability or undesirability of concentrating the litigation of the claims in the particular forum,'" in recognition of the fact that "a class action may extend beyond the boundaries of the state where the lead plaintiff brings the case." *Mussat*, 953 F3d at 448 (quoting Fed. R. Civ. P. 23(b)(3)). Accordingly, the *Mussat* court held that in a class action, "the absentees are more like nonparties, and thus there is no need to locate each and every one of them and conduct a separate personal-jurisdiction analysis of their claims." *Id.* at 448.

In *Lyngaas*, the Sixth Circuit "follow[ed] their lead in holding that *Bristol-Myers Squibb* does not extend to federal class actions" for the same reasons. *Lyngaas*, 992 F.3d at 435. Succinctly distinguishing mass actions where *Bristol-Myers Squibb* clearly applies from class actions where it does not, the Sixth Circuit explained that in the class action context

30

> [t]he defendant is presented with a unitary, coherent claim to which it need respond only with a unitary, coherent defense. In this sense, the only suit before the court is the one brought by the named plaintiff. Thus, when the court considers whether the suit arises out of or relates to the defendant's contacts with the forum, the court need analyze only the claims raised by the named plaintiff, who in turn represents the absent class members.

*Id.* at 435 (internal quotation marks and citations omitted).

The Second Circuit has not specifically taken up the issue, but other courts in this Circuit have followed this majority rule and found that *Bristol-Myers* does not apply to federal class actions. *See Cox*, 2022 WL 939732, at *18 (granting motion for class certification over defendant's personal jurisdiction objections, adopting the reasoning in *Mussat* and *Lyngaas*); *Cummings v. FCA US LLC*, 401 F. Supp. 3d 288, 317 (N.D.N.Y. 2019) ("This Court therefore does not believe that *Bristol-Myers Squibb* stands for the point of law that all putative class members in a class action must meet the requirements of personal jurisdiction imposed on plaintiffs in ordinary (non-class action) cases."); *see also Bank v. CreditGuard of Am.*, No. 18-CV-1311 (PKC) (RLM), 2019 WL 1316966, at *12 n.11 (E.D.N.Y. Mar. 22, 2019) (noting that "most district court decisions have held that *Bristol-Myers* does not apply to federal class actions" and collecting cases, but declining to decide the issue before class certification was sought). *But see In re Dental Supplies Antitrust Litig.*, No. 16-CV-696 (BMC) (GRB), 2017 WL 4217115, at *9 (E.D.N.Y. Sept. 20, 2017) (holding that *Bristol-Myers* applies to class actions in federal court and dismissing plaintiff's claims for lack of personal jurisdiction); *Spratley v. FCA US LLC*, No. 17-CV-0062, 2017 WL 4023348, at *6–7 (N.D.N.Y. Sept. 12, 2017) (same).

I agree with the majority of district courts that have addressed the issue, and with the Sixth and Seventh Circuits, and find that *Bristol-Myers* does not apply to federal class actions. Because absent class members are non-parties for jurisdictional purposes—including as explained above for the purposes of determining standing to litigate—there is no reason to treat them as parties for

31

the purposes of determining personal jurisdiction. Rather, the Court can be satisfied that personal jurisdiction exists by examining only the claims of the named plaintiff, who represents the absent class members. In this case, it is enough that the Court unquestionably has personal jurisdiction over the claims of named plaintiff, a resident of Brooklyn, New York, which arise out of or relate to Equifax's conduct in and contacts with New York. (Compl. ¶ 4; Hines Depo. Tr. at 10:4–10). The Court's foregoing examination of the requirements of Rule 23 will ensure that absent class members' claims are sufficiently similar to Hines' such that concentrating the litigation in this forum is appropriate.

III.  <u>Class Action Certification Requirements</u>

Having determined that Plaintiff has sufficiently established standing and personal jurisdiction to pursue claims against Equifax, the Court now decides whether it is appropriate to certify the Plaintiff's proposed class and subclasses.

A.  <u>Legal Standards</u>

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). As a result, the party seeking class certification must affirmatively demonstrate compliance with the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *See* Fed. R. Civ. P. 23(a); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 11 (E.D.N.Y. 2020). In the Second Circuit, a party seeking class certification must also satisfy an implied requirement of ascertainability which requires that "a proposed class is defined using objective criteria that establish a membership with definite boundaries" and does not permit certification where "a proposed class definition is indeterminate in some fundamental way." *In re Petrobras*

*Sec.,* 862 F.3d 250, 269 (2d Cir. 2017). In addition to the Rule 23(a) requirements and the implied requirement of ascertainability, a party seeking class certification "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp.*, 569 U.S. at 33. "[T]o certify a class pursuant to Rule 23(b)(3), a plaintiff must establish (1) predominance—'that the questions of law or fact common to class members predominate over any questions affecting only individual members'; and (2) superiority—'that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) (quoting Fed. R. Civ. P. 23(b)(3)).[8]

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met." *Id.; see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 202 (2d Cir. 2008) ("Today, we dispel any remaining confusion and hold that the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements."). Importantly here, the same requirements and burden apply to the certification of subclasses. *See B & R Supermarket, Inc. v. MasterCard Int'l Inc.*, No. 17-CV-02738 (MKB), 2018 WL 1335355, at *3 n.7 (E.D.N.Y. Mar. 14, 2018) ("When establishing subclasses, each subclass must meet the Rule 23 class certification

---

[8] Although Plaintiff's class action complaint contains conclusions of law that repeat the requirements of Rule 23(b)(1) (Compl. ¶ 59), his memorandum of law in support of class certification addresses only certification of an injunctive relief class under Rule 23(b)(2) and certification of a class under the predominance and superiority requirements of Rule 23(b)(3). (Pl's Mem. at 15–18). Further, as described above, Plaintiff has not demonstrated Article III standing to pursue injunctive relief. "Courts cannot permit injunctive relief . . . when plaintiffs would otherwise lack standing to seek such relief under Article III. Where there is no likelihood of future harm, there is no standing to seek an injunction, and so no possibility of being certified as a Rule 23(b)(2) class." *Berni v. Barilla S.p.A.*, 964 F.3d 141, 148–49 (2d Cir. 2020) (collecting cases); *see also Allegra v. Luxottica Retail N. Am.,* No. 17-CV-5216 (PKC) (RLM), 2022 WL 42867, at *18 (E.D.N.Y. Jan. 5, 2022) ("[T]he Second Circuit has made clear that there is no equitable or policy exception to the Article III standing requirements that would allow past purchasers like Plaintiffs to nonetheless maintain an injunctive class under Rule 23(b)(2)."). Accordingly, the Court will focus exclusively on the requirements of Rule 23(b)(3).

requirements. . . . The movant bears the burden of constructing the subclasses based on the requirements of Rule 23.") (citations omitted).

"Rule 23 should be construed 'liberally rather than restrictively'" and "[t]he 'general preference' of the Court of Appeals for the Second Circuit is 'granting rather than denying class certification.'" *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 60 (E.D.N.Y. 2015) (quoting *Gortat v. Capala Bros.*, 257 F.R.D. 353, 361–62 (E.D.N.Y. 2009)). Nevertheless, "[a] court may certify a class action only if it concludes, after a 'rigorous analysis,' that the proposed class meets the requirements of Rule 23(a) and (b)." *In re Restasis*, 335 F.R.D. at 11 (quoting *Comcast Corp.* 569 U.S. at 33–34). This rigorous "analysis may 'entail some overlap with the merits of the plaintiff's claim' . . . . [b]ut courts may decide merits issues at class certification 'only to the extent they are relevant to' the application of Rule 23." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), then quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013)).

B. Rule 23(a) Requirements and Ascertainability

1. Ascertainability

Although not an enumerated requirement under Rule 23, courts in the Second Circuit must find that "a proposed class is defined using objective criteria that establish a membership with definite boundaries" and will not certify the class where "a proposed class definition is indeterminate in some fundamental way." *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017). This is not meant to be a demanding standard; rather, "it is designed only to prevent certification of classes whose membership is actually indeterminate." *Harte v. Ocwen Fin. Corp.*, No. 13-CV-5410 (MKB) (RER), 2018 WL 1830811, at *31 (E.D.N.Y. Feb. 8, 2018) (citing *Gomez v. Lace Enters., Inc.*, No. 15 Civ. 3326 (CM), 2017 WL 129130, at *8 (S.D.N.Y. Nov. 24, 2015)), *adopted in part by*

2018 WL 1559766 (E.D.N.Y. Mar. 30, 2018). While "membership of the class must be ascertainable 'at some point in the case,' it does not necessarily have to be determined prior to class certification." *Id.* (quoting *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 287 (S.D.N.Y. 2012)).

Here, Equifax raises no objections to the ascertainability of Hines' proposed class and subclasses. As they are described above, Hines' proposed class and subclass definitions use clear, objective criteria and establish class membership with definite temporal and geospatial boundaries such that class membership can be readily determined. Indeed, membership in the nationwide FCRA Class, New York Subclass, and Capital One Subclass can be ascertained simply by examining records of dispute correspondence, and the Post-Dispute Publication Subclass can be identified by examining a combination of dispute correspondence and the "Log F" or "MDB records" of consumer credit files created when Equifax distributed its products.[9] Accordingly, the Court finds that the ascertainability requirement is satisfied as to the nationwide FCRA Class and as to each of the three subclasses.

2. <u>Numerosity</u>

Rule 23(a)(1) requires a finding that the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "In the Second Circuit, numerosity is presumed for classes

---

[9] Although Equifax has raised no direct objections to this factor, its objections to the Post-Dispute Publication Subclass may bear on ascertainability. Specifically, Equifax argues there is no way to determine whether it disseminated a consumer report about a putative class member that included a disputed inquiry because Equifax does not maintain a copy of the reports it issues or a record reflecting the contents of those reports. (Def's Opp. at 20 (citing Def's Suppl. Resp. to Interrog. No. 6; Leslie Depo. Tr 65:19–66:7; Gobin Decl. ¶ 22)). While Equifax does not retain copies of the reports it provides to its customers, MDB records provide a snapshot of the consumers' credit file at the moment an Equifax product containing their personal information is delivered, and Equifax's billing records describe the product that a customer ordered, the data that was included in the product, and the date the product was delivered. (Leslie Depo. Tr. at 15:18–17:24, 19:19–20:6). Cross referencing these documents could accordingly identify those individuals who suffered the harm alleged. Further, as the subclass is defined, membership is ascertainable by examining only correspondence and MDB records; it is liability, rather than class membership, that hinges on additional evidence proving that disputed hard inquiry information stemming from a non-consumer initiated transaction was disseminated to a third party.

of [forty] or more." *In re Restasis,* 335 F.R.D. at 11 (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)); *see also Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) (same). "[I]n assessing numerosity a court may make common sense assumptions without the need for precise quantification of the class." *Chime v. Peak Sec. Plus, Inc.* 137 F. Supp. 3d 183, 207 (E.D.N.Y. 2015) (internal quotation marks and citations omitted). "There is no requirement to specify an exact class size in order to demonstrate numerosity," *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 293 F.R.D. 287, 300 (E.D.N.Y. 2013), and "numerosity may be fulfilled by extrapolating from a sample," *Harte*, 2018 WL 1830811 at *27. "However, if 'the plaintiff's assertion of numerosity is pure speculation or bare allegations, the motion for class certification fails.'" *Pryce*, 2022 WL 1085489, at *13 (quoting *Edge v. C. Tech Collections, Inc.*, 203 F.R.D. 85, 89 (E.D.N.Y. 2001)).

According to interrogatories produced by Equifax and the testimony of Equifax representatives, ███ consumers nationwide received ███████, including ███ consumers in New York. (Def's Suppl. Resps. to Interrog. Nos. 1 and 8 at 3; Leslie Depo. Tr. at 42:12–18, 48:4–8). This is more than sufficient to satisfy the numerosity requirement for the nationwide FCRA Class and the New York Subclass. With respect to the Capital One Subclass, Equifax has produced ██████ hard inquiry dispute letters that mention "Capital One," (Sartell Decl. ¶¶ 3–5), which gives rise to a common sense assumption that at least forty class members, if not the full ███, disputed a hard inquiry associated with Capital One. Those class members would have received ███████ pursuant to Equifax's internal policies. (Gobin Decl. ¶ 20). Finally, with respect to the Post-Dispute Publication Subclass, MDB records indicate that for New York consumers alone, Equifax delivered information regarding more than ███ of the New York consumers to third parties after it had already received a hard inquiry dispute from

the consumer. (Def's Suppl. Resp. to Pl's Interrog. No. 6 at 2; Leslie Depo. Tr. at 47:3, 59:9–19, 64:1–15, 82:14–83:3). Extrapolating from this sample, it is reasonable to assume that an even greater number of consumers received similar treatment nationwide, and that Equifax disseminated disputed hard inquiry information stemming from a non-consumer initiated transaction to a third party in more than forty of those cases. Accordingly, the court finds that the numerosity requirement is satisfied for the nationwide FCRA Class and for each of the three subclasses.

3.  Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Even a single common question will do." *Dukes*, 564 U.S. at 359 (alterations and citations omitted). To show commonality, a movant must demonstrate that the class claims "depend upon a common contention" that "is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. "[W]hat matters to class certification is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (internal quotation marks and citations omitted). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson*, 780 F.3d at 137–38 (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014)).

Hines asserts that commonality is satisfied here because the nationwide FCRA class and the subclasses raise common factual and legal questions with respect to Equifax's "standard policies and practices" for processing and reinvestigating hard inquiry disputes, for preventing its customers, including Capital One, from obtaining consumer reports for impermissible purposes

without authorization, and for preventing disputed hard inquiries from being disseminated in subsequent consumer reports. (Pl's Mem. at 12–13). Equifax generally raises concerns regarding predominance that are more adequately evaluated under the framework of Rule 23(b), but briefly notes that Hines' common questions "all reduce to the same inquiry: Did Equifax violate the FCRA and NYFCRA?" which "does little to advance the resolution of this case" and renders the commonality requirement unsatisfied. (Def's Opp. at 12–13, 13 n.9). I disagree. Because common factual questions regarding the uniform application of Equifax's policies and practices and common legal questions regarding the reasonableness of those policies and practices sit at the core of this action and apply to all class and subclass members, the Court finds that Plaintiff has sufficiently demonstrated compliance with Rule 23's commonality requirements.

4. Typicality

Rule 23(a)(3) requires a finding that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "While the commonality inquiry establishes the existence of a certifiable class, the typicality inquiry focuses on whether the claims of the putative class representatives are typical of the class sharing common questions." *In re Frontier Ins. Grp., Inc. Sec. Litig.*, 172 F.R.D. 31, 40 (E.D.N.Y. 1997). Typicality is found "when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 121 (E.D.N.Y. 2019) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)); *see also Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 82 (E.D.N.Y. 2007) ("The typicality requirement is generally satisfied 'as long as plaintiffs assert that defendants committed the same wrongful acts in the same manner against all members of the class.'") (quoting *In re Medical X-ray Film Antitrust Litigation*, No. 93-CV-5904, 1997 WL 33320580 at *4 (E.D.N.Y. Dec. 26,

1997)). "Minor variations in the fact patterns underlying individual claims" will not preclude typicality. *Robidoux*, 987 F.2d at 936–37. But while "the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 59 (2d Cir. 2000) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990), *abrogated on other grounds by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017)).

Hines asserts that his "claims are typical of those of other class members." (Pl's Mem. at 13). In particular, he contends that he and all other nationwide FCRA class members disputed a hard inquiry in writing and received Equifax's ▮▮▮▮▮▮▮ form response pursuant to Equifax's inadequate reinvestigation policy (Pl's Mem. at 13). He contends that his claims are typical of the New York Subclass members as he is a New York resident who suffered the same injury from the same course of conduct as other New York resident subclass members (Pl's Mem. at 14), that his claims are typical of the Capital One Subclass because he and all other subclass members disputed the unauthorized dissemination of private information to Capital One (Pl's Mem. at 14), and that his claims are typical of the Post-Dispute Publication subclass because he suffered the same harm from the same course of conduct when Equifax included a disputed, unauthorized hard inquiry in credit products that it disseminated to customers (Pl's Mem. 14). Equifax does not oppose class certification on typicality grounds, and has identified no defenses which uniquely apply to Hines' claims that threaten to become a focus of the litigation. Because each class and subclass member's claim depends on the same legal arguments and the same underlying course of conduct by Equifax,

and because no unique defenses applicable only to Hines are apparent from the record, the Court finds that the typicality requirement of Rule 23(a)(3) is satisfied.

5.  <u>Adequacy of Representation</u>

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In assessing adequacy of representation, courts consider "whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) [whether] plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons*, 502 F.3d 91, 99 (2d Cir. 2007) (quoting *Baffa*, 222 F.3d at 60). "This process 'serves to uncover conflicts of interest between named parties and the class they seek to represent.'" *Id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997)). "Courts rarely deny class certification on the basis of the inadequacy of class representatives, doing so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." *Bayne*, 2021 WL 4822426, at *7 (quoting *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 51 (S.D.N.Y. 2012)). Indeed, "the requirement that the class representative have knowledge of the facts of the case is a 'modest one.'" *Vergara v. Apple REIT Nine, Inc.*, No. 19-CV-2027 (DLI) (RML), 2021 WL 1103348, at *3 (E.D.N.Y. Feb. 5, 2021) (quoting *Decastro v. City of New York*, No. 16 Civ. 3850, 2019 WL 4509027, at *12 (S.D.N.Y. Sept. 19, 2019)).

Defendant here does not challenge the adequacy of Plaintiff or his chosen counsel. Plaintiff contends that he holds no conflicts of interest, and Defendant has not uncovered any such conflicts in deposing him. (Pl's Mem. at 14–15; Hines Depo. Tr. at 119:16–124:15). Further, Hines has demonstrated sufficient familiarity with the suit, his claims, and his role as class representative to

40

meet the "modest" requirements of Rule 23(a)(4). (Pl's Mem. at 14; *see also* Hines Depo. Tr. at 117:9–23, 119:2–123:23). With respect to counsel: Hines is represented by five law firms, four of which have demonstrated experience in pursuing complex FCRA and consumer protection claims in individual representations and in the class action context. (Pl's Mem. at 14 n.10 (discussing the experience of Francis Mailman Soumilas, P.C., Skaar & Feagle, LLP, Robert Sola, P.C., and The Adkins Firm, P.C.); *see also* ECF Nos 44-23–44-26 (collectively, "Firm Bios") (same)). Indeed, these same four firms are counsel of record in the *Rivera* Action. (ECF No. 27 at 2 n.2).[10] Because Defendant has not challenged the adequacy of the Plaintiff or his chosen counsel, because Plaintiff's interests are not antagonistic to the class, and because his counsel have sufficient qualifications to represent the class, the Court concludes that the Plaintiff has satisfied his burden of establishing adequacy under Rule 23(a)(4).

C. Rule 23(b)(3) Requirements—Predominance and Superiority

Having found that Plaintiff satisfies Rule 23(a)'s requirements, the Court must consider whether he has satisfied the requirements of Rule 23(b)(3). A court may only certify a class under Rule 23(b)(3) if it "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

1. Predominance

In the Second Circuit, "[p]redominance is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting

---

[10] The omission of the Mallon Consumer Law Group, PLLC is discussed further below. *See infra* Section III.D.

*Catholic Healthcare W. v. U.S. Foodservice Inc. (In re U.S. Foodservice Inc. Pricing Litig.)*, 729 F.3d 108, 118 (2d Cir. 2013)); *see also In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2020 WL 4694172, at \*14 (S.D.N.Y. Aug. 13, 2020) ("Common questions are not just 'more substantial' than individual ones — they form the crux of the class claims.") (citing *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010)).

Evaluating predominance requires a "'more demanding'" inquiry than that required to find commonality under Rule 23(a), in which courts examine whether "common issues can profitably be tried on a class-wide basis, or whether they will be overwhelmed by individual issues." *Johnson*, 780 F.3d at 138 (quoting *Comcast Corp.,* 569 U.S. at 34); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) ("The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." (internal quotation marks and citations omitted)). As a result, courts must "give careful scrutiny to the relation between common and individual questions in a case." *Bouaphakeo*, 577 U.S. at 453. "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Id.* (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–97 (5th ed. 2012)).

In undertaking the predominance inquiry, courts typically begin by considering the elements of the underlying causes of action. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG) (VVP), 2014 WL 7882100, at \*35 (E.D.N.Y. Oct. 15, 2014) (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011)), *adopted by* 2015 WL 5093503 (July 10, 2015). However, the rule "does not require a plaintiff seeking class certification to prove that

each element of [his] claim is susceptible to class wide proof," but requires that he "show that 'questions common to the class predominate, and not that those questions will be answered, on the merits, in the favor of the class.'" *Hasemann v. Gerber Prod. Co.,* 331 F.R.D. 239, 273 (E.D.N.Y. 2019) (quoting *Amgen*, 568 U.S. at 459, 468)). "Typically, common issues predominate when liability is determinable on a class-wide basis, even where class members have individualized damages." *Id.* (citing *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 139 (2d Cir. 2001), *abrogated on other grounds by In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24 (2d Cir. 2006)). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Bouaphakeo*, 577 U.S. at 453–454 (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–124 (3d ed. 2005)).[11]

   a.   <u>Section 1681i — Reinvestigation Class Claims</u>[12]

Section 1681i requires that "if a consumer notifies a consumer reporting agency—either directly or indirectly [through a reseller]—of a dispute as to the accuracy of any item of

---

[11] Equifax argues, in part, that the Court cannot certify a class where individual questions regarding damages will predominate. (Def's Opp. at 20–23). However, as noted above, individualized issues with respect to damages do not necessarily preclude a finding that common issues predominate. Indeed, "it is well-established in this Circuit that 'individualized damages determinations alone cannot preclude certification under Rule 23(b)(3),' and proponents of class certification need not 'rely upon a class-wide damages model to demonstrate predominance.'" *Pryce*, 2022 WL 1085489, at *19 n.8 (citing *Roach*, 778 F.3d at 408–09). Further, as Hines notes, since statutory and punitive damages are sought here for each class member, rather than actual damages, no such individualized inquiry is required. (Pl's Mem. at 16).

[12] Violations of the reinvestigation provisions of the NYFCRA are evaluated in an identical manner to those brought under Section 1681i. *See, e.g.*, *Ogbon v. Beneficial Credit Servs., Inc.*, No. 10 Civ. 3760 (PAE), 2013 WL 1430467, at *9 n.7 (S.D.N.Y. Apr. 8, 2013) ("[T]he Court construes [N.Y. Gen. Bus. Law § 380-f(a)] in the same way as its similar federal analogue."); *Abdallah v. LexisNexis Risk Sols. FL Inc.*, No. 19-CV-3609 (RRM) (VMS), 2021 WL 1209419, at *8 (E.D.N.Y. Mar. 30, 2021), *reconsideration denied*, 2021 WL 6197060 (E.D.N.Y. Dec. 30, 2021).

information contained in his file, within thirty days of notification, the consumer reporting agency 'shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate.'" *Khan v. Equifax Info. Servs., LLC*, No. 18-CV-6367 (MKB), 2019 WL 2492762, at *3 (E.D.N.Y. June 14, 2019) (quoting 15 U.S.C. § 1681i(a)(1)(A); *Jones*, 982 F. Supp. 2d at 272 (S.D.N.Y. 2013)). "What constitutes a 'reasonable' reinvestigation depends on the circumstances of the allegations." *Id.* (citing *Jones*, 982 F. Supp. 2d at 272)). However, in undertaking a reinvestigation, the agency must at a minimum "review and consider all relevant information submitted by the consumer . . . with respect to such disputed information," and must forward such relevant information to "any person who provided any item of information in dispute." 15 U.S.C. §§ 1681i(a)(2), (4). Importantly, "the statutory responsibility imposed on the credit report agency 'must consist of something more than merely parroting information received from other sources.'" *Jones*, 982 F. Supp. 2d at 273 (quoting *Gorman v. Experian Info. Solutions, Inc.*, No. 07 Civ. 1846 (RPP), 2008 WL 4934047, at *5 (S.D.N.Y. Nov. 19, 2008)). If an agency reasonably determines that the consumer's dispute is "frivolous or irrelevant"—for example, where the consumer fails to provide sufficient information to conduct a reinvestigation—it may terminate its reinvestigation of a consumer's dispute, provided that it provides the consumer with notice within five days of making that determination, explaining the agency's reasoning and identifying any information that it would need to actually investigate the dispute. 15 U.S.C. § 1681i(a)(3). "Ultimately, it is up to the trier of fact to weigh [various] considerations in determining whether the CRA conducted a reasonable reinvestigation" under the circumstances. *Jones*, 982 F. Supp. 2d at 273 (citing *Cushman v. TransUnion Corp.*, 115 F.3d 220, 226 (3d Cir. 1997)).

Unless the dispute is made through a reseller, a consumer must directly dispute an alleged inaccuracy in order to trigger the duty to reinvestigate. 15 U.S.C. § 1681i(a)(1)(A); *see also Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 104 (2d Cir. 1997) ("[T]he statutory duty [to reinvestigate] is triggered only by direct requests from *consumers*, and . . . no claim could have arisen here until [plaintiff] himself communicated with TransUnion to dispute his credit record."). "A consumer has not 'directly' contacted a credit reporting agency when . . . she merely signs up for a credit repair service and then has no further involvement with, or even knowledge of, the disputes submitted putatively on her behalf." *Cohen v. Equifax Info. Servs., LLC*, No. 18 Civ. 6210 (JSR), 2019 WL 5200759, at *6 (S.D.N.Y. Sept. 13, 2019). *But see Milbauer v. TRW, Inc*., 707 F. Supp. 92, 95 (E.D.N.Y. 1989) (holding that "consumer reporting agencies . . . are not privileged to ignore a consumer's dispute simply because that dispute is submitted by a third party," and noting that such third party submissions "do[] not constitute a complete defense" to reinvestigation claims).

Additionally, to succeed on a Section 1681i claim, a plaintiff "must demonstrate that the disputed information is inaccurate." *Khan*, 2019 WL 2492762, at *3 (quoting *Gestetner v. Equifax Info. Servs. LLC*, No. 18 Civ. 5665 (JFK), 2019 WL 1172283, at *2 (S.D.N.Y. Mar. 13, 2019)); *see also Cohen v. Equifax Info. Servs., LLC*, 827 F. App'x 14, 16 (2d Cir. 2020) (summary order) ("The parties agree that a plaintiff must demonstrate that her credit report contained inaccurate information in order to prevail on a claim under § 1681e(b) or § 1681i."); *Artemov v. TransUnion, LLC*, No. 20-CV-1892 (BMC), 2020 WL 5211068, at *2 (E.D.N.Y. Sept. 1, 2020) ("In considering a challenge under § 1681e(b) or § 1681i, the 'threshold question' is whether the disputed credit information is accurate; if the information is accurate, 'no further inquiry into the reasonableness of the consumer reporting agency's procedure is necessary.'") (quoting *Whelan v. TransUnion*

45

*Credit Reporting Agency*, 862 F. Supp. 824, 829 (E.D.N.Y. 1994)); *Jones*, 982 F. Supp. 2d at 272–73 (S.D.N.Y. 2013) ("[A] 'plaintiff asserting claims under § 1681i must demonstrate that the disputed information is inaccurate in order to prevail on allegations that a consumer reporting agency had failed to reasonably reinvestigate a disputed item.'") (quoting *Fashakin v. Nextel Commc'ns.*, No. 05-CV-3080 (RRM), 2009 WL 790350, at *11 (E.D.N.Y. Mar. 25, 2009)). "Although the Second Circuit has yet to address the issue, 'the overwhelming weight of authority holds that a credit report is inaccurate either when it is patently incorrect or when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect on credit decisions.'" *Abdallah*, 2021 WL 6197060, at *7 (quoting *Gross v. Priv. Nat'l Mortg. Acceptance Co., LLC*, 512 F. Supp. 3d 423, 426 (E.D.N.Y. 2021)). If disputed information is found to be inaccurate or incomplete, or if it cannot be verified pursuant to a reinvestigation, it must be deleted from the consumer's credit report. *See* 15 U.S.C. § 1681i(a)(5)(A)(i); *see also Okocha v. TransUnion LLC*, No. 08-CV-3107, 2011 WL 2837594, at *7 (E.D.N.Y. Mar. 31, 2011), *aff'd* 488 F. App'x 535 (2d Cir. 2012)).

Plaintiff maintains that with respect to his Section 1681i claims, Equifax's transmission of ████████████ to all nationwide FCRA class members and New York Subclass members in response to hard inquiry disputes, and the legal sufficiency of that transmission to satisfy Section 1681i's reinvestigation requirements are common factual and legal issues that predominate over any individual issues. (Pl's Mem. at 15). However, as described in more detail below, Equifax argues that "overwhelmingly individualized evidence" rather than "common proof" must be presented to show that each disputed hard inquiry was in fact "inaccurate" and to show that each hard inquiry was disputed "directly" by the individual consumer class member,

such that the predominance requirement is not satisfied and class certification is unwarranted. (Def's Opp. at 13–18).

With respect to "inaccuracy," Equifax argues that its policy of categorizing disputes as "Miscellaneous/Not Mine" cannot be relied upon to determine whether an inquiry was, in fact, unauthorized and therefore inaccurate, particularly since certain dispute letters produced in this case were sorted into that category but do not clearly articulate the reason for the dispute, or otherwise indicate that the inquiry may have been disputed for different reasons. (Def's Opp. at 5– 6, 14). For example, Equifax argues that produced dispute letters sorted into the "Miscellaneous/Not Mine" category reveal instances where consumers disputed an inquiry because Equifax failed to comply with the "permissible purpose" provisions of the FCRA or because the inquiry was otherwise "false" without further explanation. (Def's Opp. at 5–6; *see also* Pritchard Decl. ¶¶ 6–7). Further, Equifax argues that consumers may have disputed an accurate inquiry as "unauthorized" because they forgot that they engaged in the transaction that resulted in the inquiry, did not recognize the name of the creditor as it appeared on their credit report, did not expect a known transaction to result in an inquiry, or falsely disputed the inquiry in an attempt to improve their credit score. (Def's Opp. at 5; *see also* Gobin Decl. ¶ 12; Hendricks Depo. Tr. at 54:4–18; Turner Expert Rep. ¶ 18).

According to Equifax, determining whether an inquiry was "unauthorized" and "inaccurate" will therefore require a direct review of each consumer's individual dispute correspondence, review of other relevant documents, and testimony from consumers and from the representatives of data inquirers to determine whether each disputed inquiry was actually authorized, or whether the data inquirer believed they had some other permissible purpose to obtain the information. (Def's Opp. at 14–16). As a result, Equifax maintains that individual issues of fact predominate

and will demand thousands of mini-trials to determine whether each class member has a valid claim. Indeed, Equifax argues that adjudicating Hines' individual claims will require a review of documentation and testimony from Hines and from Capital One to determine whether he applied for credit and authorized the Capital One Inquiry, and that the same process must be followed "for each putative class member" showing "consumer-specific evidence proving that the inquiries about them should not have occurred." (Def's Opp. at 15 (citing *Mazzei v. Money Store,* 829 F.3d 260, 232–73 (2d Cir. 2016)).

   Plaintiff responds that class-wide proof can demonstrate, and indeed has demonstrated, that upon notification of a presumptively bona fide dispute from a consumer regarding a hard inquiry,[13] Equifax uniformly responds by sending ███████████ without further investigating the circumstances of the inquiry, and therefore uniformly fails to satisfy its obligations under Section 1681i to delete disputed information, reinvestigate disputed information, or decline to reinvestigate for cause upon proper notice to the consumer. (Pl's Reply at 5–9). According to Hines, Equifax should have conducted individualized inquiries into the accuracy of disputed information, reviewed documentary evidence, and considered statements from complaining consumers and relevant data inquirers regarding whether the inquiry was authorized or otherwise inaccurate within the thirty day window for reinvestigation established by § 1681i, or alternatively should have notified the complaining consumer at that time that he or she did not provide sufficient information to conduct such an inquiry. (Pl's Reply at 4). Put differently, Hines argues that Equifax

---

[13] According to the Federal Trade Commission,"[a] CRA must assume a consumer's dispute is bona fide, unless there is evidence to the contrary. Such evidence may constitute receipt of letters from consumers disputing all information in their files without providing any allegations concerning the specific items in the files, or of several letters in similar format that indicate that a particular third party (e.g., a 'credit repair' operator) is counseling consumers to dispute all items in their files, regardless of whether the information is known to be accurate." Fed. Trade Comm'n, *40 Years of Experience With the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations,* 2011 WL 3020575, at *69 (July 2011) (citing 1990 Commentary on the Fair Credit Reporting Act, Appendix to Part 600, comment 611-11).

"cannot now claim . . . that had it reinvestigated it would have come up with results that showed that some of the inquiries were accurate." (Pl's Reply at 6). Rather, their failure to reinvestigate constitutes a violation of § 1681i, and "[t]o require more of a disputing consumer now, as Equifax suggests, when the agency neither reinvestigates nor deletes the disputed information, places consumers in an untenable Catch 22." (Pl's Reply at 8). Further, Hines argues that to the extent merits discovery exposes evidence indicating that Equifax shared consumer data for permissible purposes, or that Equifax properly declined to investigate, the relevant individuals can be identified using representative or statistical methods and can be administratively removed from the class. (Pl's Reply at 4 n.3).

With respect to "directness," Equifax argues that determining whether a consumer class member directly disputed his or her inquiry will similarly require reviewing individual dispute correspondence "for indicia that the dispute was made by a [credit repair organization] or other third party"—such as ███████████████████████████████████████████████ ███████████████████████████████████████—and would require the assessment of further evidence related to the class member's participation in generating and submitting the dispute to make an affirmative determination that he or she "directly" disputed the alleged inaccuracy. (Def's Opp. at 17–18; *see also* Gobin Decl. ¶ 14). To support this argument, Equifax points to ████ dispute letters which contain such indicia of indirectness. (Def's Opp. at 18; *see also* Pritchard Decl. ¶¶ 3–5). Hines argues that these alleged indicia of indirectness are based in speculation and are supported by cherry-picked evidence, and that to the extent "indirect disputes" exist and preclude recovery, the relevant class members can be identified and administratively removed from the class. (Pl's Reply at 9–10).

49

Although Equifax raises legitimate concerns regarding the feasibility of evaluating individualized issues of inaccuracy and directness, the crux of the class claim here is whether treating disputed hard inquiries as accurate without any further investigation, sending ███████ ███, and shifting the burden to consumers to investigate allegedly unauthorized inquiries by contacting their customers satisfies Equifax's reinvestigation obligations under § 1681i. Hines has demonstrated that Equifax's common course of conduct in response to hard inquiry disputes is susceptible to class-wide proof, (*see, e.g.*, Equifax Dispute Policy Manual v.17 at 37; Equifax Dispute Policy Manual v.22 at 35; Equifax Training & QA at 3; Gobin Decl ¶¶ 9, 18, 20), and the legal sufficiency of Equifax's reinvestigation practices may therefore be evaluated on a class-wide basis. While inaccuracy and directness are "important matter[s]" bearing on individual class members' ability to recover that may "have to be tried separately," *Bouaphakeo*, 577 U.S. at 453–54, or may require developing a method of administratively removing individuals from the class, issues regarding the legal sufficiency of Equifax's common course of conduct predominate over these individualized issues. Accordingly, these individualized issues do not defeat predominance.

Therefore, despite Equifax's legitimate concerns regarding individualized accuracy and directness issues, I find that common legal questions susceptible to class-wide proof predominate such that Plaintiff's claims under § 1681i and N.Y. Gen. Bus. Law § 380-f are amenable to class resolution.

b.  Section 1681e(a) — Capital One Subclass Claims

Because the statutes reference one another, the Court considers the Reasonable Procedures claims brought on behalf of the Capital One Subclass under sections 1681e(a) and 1681b together. Section 1681e(a) requires that consumer reporting agencies "maintain reasonable procedures designed . . . to limit the furnishing of consumer reports to the purposes listed under section

1681b. . . . These procedures shall require that prospective users of the information identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose." 15 U.S.C. § 1681e(a); *see also Pietrafesa v. First Am. Real Est. Info. Servs., Inc.*, No. 05-CV-1450, 2007 WL 710197, at *3 (N.D.N.Y. Mar. 6, 2007) ("These reasonable procedures must include a requirement that the prospective users of information: (1) identify themselves; (2) certify the purposes for which the information is sought; and (3) certify that the information will be used for no other purpose."). Under this section, "no consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 1681b[.]" 15 U.S.C. § 1681e(a). "To determine whether the consumer reporting agency maintained reasonable procedures, the standard of conduct is what a reasonably prudent person would do under the circumstances." *Pietrafesa*, 2007 WL 710197, at *3 (quoting *Dobson v. Holloway*, 828 F. Supp. 975, 977 (M.D. Ga. 1993)); *see also Obabueki v. Int'l Bus. Machines Corp.*, 145 F. Supp. 2d 371, 395–96 (S.D.N.Y. 2001) (liability may be imposed upon a credit reporting agency for failing to act reasonably in complying with the FCRA), *aff'd* 319 F.3d 87 (2d Cir. 2003).[14]

In turn, "[t]o prove a violation of section 1681b, a plaintiff must show that credit information was obtained for an impermissible purpose." *Ogbon*, 2013 WL 1430467, at *10 (quoting *Stonehart v. Rosenthal*, No. 01 Civ. 651 (SAS), 2001 WL 910771, at *3 (S.D.N.Y. Aug. 13, 2001); citing *Perl v. Am. Express*, 12 Civ. 4380 (ER), 2012 WL 2711270, at *2 (S.D.N.Y. July 9, 2012)). "Conversely, a showing of a permissible purpose is a complete defense." *Stonehart*, 2001 WL 910771, at *3 (citing *Advanced Conservation Sys. Inc. v. Long Island Lighting Co.*, 934 F. Supp.

---

[14] Notably, only one court in this Circuit has evaluated claims brought specifically for violations of § 1681e(a). *See Pietrafesa*, 2007 WL 710197, at *4 (finding on summary judgment that defendant agency complied with the requirements enumerated in § 1681e and that plaintiff "failed to identify any deviations from the standard of care to be used by credit reporting agencies in maintaining reasonable procedures to comply with §§ 1681b and 1681c")).

53, 54 (E.D.N.Y.1996)). Further, "[t]he fact that a consumer report is furnished for an impermissible purpose does not result in automatic liability. Liability is imposed only when the consumer reporting agency either willfully or negligently fails to maintain reasonable procedures to avoid violations of, *i.e.,* § 1681b." *Pietrafesa*, 2007 WL 710197, at *3 (internal quotation marks and alterations omitted)); *see also Betz v. Matte*, No. 12-CV-5946 (SJF) (ETB), 2013 WL 5603846, at *2 (E.D.N.Y. Oct. 10, 2013) ("To state a claim based on Section 1[6]81b of the FCRA, 'a plaintiff must allege both that the defendant used or obtained the plaintiff's credit report for an impermissible purpose, and that the violation was willful or negligent.'") (quoting *Perl*, 2012 WL 2711270, at *2).

In connection with the § 1681e(a) claims of the Capital One Subclass, Plaintiff argues that in addition to common factual questions regarding the procedures used by Equifax to prevent unauthorized disclosures to its customers generally and to Capital One in particular, common legal questions regarding the reasonableness of those procedures predominate over any individualized issues. (Pl's Mem. at 16; *see also* Pl's Reply at 10–11). Equifax argues that even assuming class members' disputed Capital One inquiries correspond with truly unauthorized transactions, there are other permissible purposes for obtaining consumer information that Capital One may have had, such that "to adjudicate the class members' [claims], the factfinder would have to delve even more deeply into the class member-specific facts to determine if Capital One had *any* permissible purpose to obtain their consumer report," and would need to prove that Equifax had a "reason to believe" that Capital One would not use the data for a permissible purpose. (Def's Opp. at 19).

Although individual questions concerning whether Capital One had a permissible purpose to obtain consumer information are relevant here, such questions are secondary to and outweighed by common questions concerning the reasonableness of Equifax's standardized procedures.

Specifically, the Court is satisfied that questions of law concerning whether Equifax's procedures meet the minimum requirements established by § 1681e(a) and were objectively reasonable as applied to its transactions with Capital One, are susceptible to common proof and predominate over those individualized issues that can be adjudicated separately. Indeed, even if showing a permissible purpose as to certain class members would serve as a complete defense, the fact that such a defense "may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." *In re Visa Check*, 280 F.3d at 138 (quoting *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288. 296 (1st Cir. 2000)). "[T]he question for purposes of determining predominance is not whether a defense exists, but whether the common issues will predominate over the individual questions raised by that defense." *Id.* Here again, Equifax's common course of conduct and generally applicable procedures are the predominant concern, rather than their application to each class member's disputed inquiry. Further, while Equifax argues that liability requires a finding that Equifax had a "reason to believe" that Capital One acted improperly in each instance (Def's Opp. at 19), the high volume of Capital One-related dispute letters suggests that representative or statistical proof may be used to evaluate whether, under the circumstances, Equifax should have known Capital One was improperly using consumer data. (*See* Pl's Reply at 10; *see also* Sartell Decl. ¶¶ 3–5).

   c.   <u>Section 1681b(c)(3) — Post Dispute Publication Subclass</u>

   Under Section 1681b(c)(3), "a consumer reporting agency shall not furnish to any person a record of inquiries in connection with a credit or insurance transaction that is not initiated by a consumer." 15 U.S.C. § 1681b(c)(3). As Equifax notes, there is a scarcity of case law evaluating claims brought under this section. (*See* Def's Opp. at 11 n.8). Nevertheless, the application of the provision is straightforward—an agency violates this provision by furnishing to any person a

record of an inquiry that corresponds with a credit or insurance transaction that the consumer did not initiate.

Plaintiff contends that the Post-Dispute Publication Subclass claims raise "predominating factual issue[s]" regarding whether a consumer disputed a hard inquiry with Equifax and "whether Equifax prepared a credit report about that consumer for one of its customers after the dispute that included the disputed hard inquiry[,]" which "implicate[] the legal issue of whether such conduct violates" the provisions of § 1681b(c)(3). (Pl's Mem. at 15–16). Equifax argues that in addition to proving that each class member's disputed inquiry was, in fact, "unauthorized," these claims require proving that each class member's disputed hard inquiry was shared with a third party, and that there is no common evidence available to establish that element of the claim since Equifax does not retain copies of the consumer reports it transmits to its customers. (Def's Opp. at 20 (citing Pl's Mem. at 8; Def's Suppl. Resp. to Pl's Interrog. No. 6; Leslie Depo. Tr. at 65:19–66:7, 83:4–20; Gobin Decl. ¶ 22). Hines replies that the MDB records reflecting the sale of credit reports to third parties should suffice as common evidence to prove these claims, and further contends that certification should not be defeated simply because Equifax—a data broker—maintains unreliable records. (Pl's Reply at 11–12).

In general, "[c]ommon issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria, thus rendering unnecessary an evidentiary hearing on each claim." *Shady Grove*, 293 F.R.D. at 306 (quoting *Smilow v. Sw. Bell Mobile Sys's., Inc.*, 323 F.3d 32, 40 (1st Cir.2003)). Here, using computer records and objective criteria, Equifax has been able to identify and aggregate those New Yorkers who received ██████████ and about whom information was transmitted after a hard inquiry dispute was made (Def's Suppl. Resp. to Pl's Interrog. No. 6 at 2), and has suggested that Log F

and MDB records generated at the time of delivery can be cross referenced against Equifax's billing records to determine whether the product delivered included the disputed hard inquiry information (Leslie Depo. Tr. at 15:18–17:24).

Importantly, though, these computer records are not able to determine whether the consumer initiated the transaction that caused the hard inquiry. And unlike the FCRA Class claims, which focus predominantly upon the propriety of Equifax's uniform reinvestigation practices in response to hard inquiry disputes, and the Capital One Subclass claims, which predominantly turn on the reasonableness of its standardized procedures in preventing the disclosure of consumer data for impermissible purposes, the Post-Dispute Publication Subclass claims turn entirely on the individualized, non-consumer-initiated nature of the inquiry. Put differently, the Post-Dispute Publication Subclass claims do not rely on a uniform or standardized practice adhered to by Equifax, but hinge on whether the individual consumer initiated the underlying transaction. Thus, while aggregate proof may be available to administratively manage certain aspects of the Post-Dispute Publication claims, assessing Equifax's conduct raises predominantly individualized questions and is not suitable to class adjudication.

Because the predominance requirement is not satisfied with respect to these claims, I respectfully recommend that Your Honor deny class certification with respect to the Post-Dispute Publication Subclass.

2. Superiority

Rule 23(b)(3) requires a plaintiff establish "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In assessing superiority, Rule 23 advises that courts might consider "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature

of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D). "Rule 23(b)(3) class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 130; *see also Amchem Prods., Inc.*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.") (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)).

Plaintiff argues that the "consumer claims" here are "particularly appropriate for class resolution," where "Equifax has violated the rights of [sic] large number of geographically dispersed persons to such an extent that the cost of pursuing individual litigation to seek recovery against a well-financed adversary is not feasible," and where "the alternatives to a class action are either no recourse for tens of thousands of consumers, or . . . a multiplicity of thousands of scattered suits resulting in the inefficient administration of litigation." (Pl's Mem. at 17). Equifax does not contest whether the superiority requirement has been satisfied. The Court agrees that the class action mechanism typically offers a more efficient method of redressing harms caused by FCRA violations. *See, e.g.*, 7 Newberg on Class Actions § 21:4 (5th ed. 2021) ("FCRA matters remain good candidates for class actions—they tend to involve a large number of harmed individuals with small claims, often disbursed throughout the country. Absent a class suit, many

FCRA violations would remain un-remedied."). However, the nature and extent of the *Rivera* Action gives me pause with respect to nationwide FCRA Class.

Hines specifically brought the *Rivera* Action to the Court's attention to stand for the proposition that certification in *Rivera* "directly supports his position that class certification in this matter is warranted and should be granted in this case." (ECF No. 47). While "a multiplicity of class-action filings is not necessarily 'needless,'" and "may aid a district court in determining, early on, whether class treatment is warranted," *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1811 (2018), the maturity of this first-filed,[15] duplicative litigation that "has already begun by . . . class members" militates against certifying an overlapping nationwide FCRA class here. Fed. R. Civ. P. 23(b)(3)(B).

In general, parallel and overlapping class actions create problems related to duplicative litigation and fees, risk disparate verdicts, and undermine the goals of judicial economy that the class action device was meant to advance. *See, e.g.*, *Galvan v. Mnuchin*, No. 20-CV-4511, 2020 WL 8259110, at *3 (N.D. Ill. Oct. 15, 2020) ("Considerable authority counsels against certifying a redundant class.") (collecting authorities); 7B C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1798.1 (3d ed. 2022) ("[C]ompeting and duplicative actions not only generate unnecessary litigation and duplicative fees, but also they may result in delay, pose complicated

---

[15] "The first-filed rule is a well-established Second Circuit doctrine, based on the principle that 'where there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience or special circumstances giving priority to the second.'" *Thomas v. Apple-Metro, Inc.*, No. 14 Civ. 4120 (VEC), 2015 WL 505384, at *2 (S.D.N.Y. Feb. 5, 2015) (quoting *First City Nat'l Bank & Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir. 1989)). This rule "embodies considerations of judicial administration and conservation of resources by avoiding duplicative litigation and honoring the plaintiff's choice of forum." *Travis v. Navient Corp.*, 284 F. Supp. 3d 335, 348 (E.D.N.Y. 2018) (quoting *Emp'rs Ins. of Wausau v. Fox Entm't Grp., Inc.*, 522 F.3d 271, 274–75 (2d Cir. 2008). *See also, e.g.*, *Baduria v. Sealift Holdings, Inc.*, 451 F. Supp. 3d 248, 257 (E.D.N.Y. 2020) (transferring a putative class action to the Western District of Louisiana under the "first filed" rule). *But see Shimon v. Equifax Info. Servs. LLC*, No. 18-CV-2959 (BMC), 2018 WL 4906245, at *3 (E.D.N.Y. Oct. 9, 2018) (finding that the first-filed rule should not be applied to stay or dismiss claims where putative class actions do not entirely overlap), *aff'd*, 994 F.3d 88 (2d Cir. 2021).

problems of judicial coordination in some instances, increase the risk of disparate verdicts raising serious questions of fairness, and, in situations in which there are limited funds available as compensation, result in the unequal distribution of those funds."); Rhonda Wasserman, *Dueling Class Actions*, 80 B.U. L. Rev. 461, 542 (2000) ("Whenever two or more class actions are filed on behalf of the same class, seeking the same relief for the same wrong, numerous problems result: (1) scarce resources are wasted, (2) counsel are subject to intense pressure to settle, (3) class counsel, class members and the court all are compelled to make important decisions without complete information, and (4) courts are required to grapple with complex and difficult preclusion questions. These problems seriously undermine the utility of the class action vehicle.").

In addition to sharing the same class members and the same reinvestigation claims brought under the FCRA, the sharing of discovery with the *Rivera* Action further demonstrates the potential for such concerns. As has been noted, Hines has secured the reproduction of substantial evidence from the *Rivera* Action to demonstrate that Rule 23's requirements are satisfied here. (Pritchard Decl. ¶ 2 (noting that ███████ dispute letters produced in *Rivera* were reproduced here); *see also* ECF No. 27)). On one hand, coordinating discovery among the two actions enables certain efficiencies by preventing duplication of effort in the fact gathering process; on the other, the efficiencies that result are likely outweighed by the inefficiencies of having multiple lawyers from multiple firms duplicating efforts to review the same materials on behalf of the same class members but on behalf of different named class representatives in different fora, thereby increasing attorneys' fees, reducing the amount of compensation available to the class upon recovery, and increasing the risk that inconsistent decisions will be made based on the same proffered evidence.

Beyond issues regarding the nature and extent of the *Rivera* Action, the remaining Rule 23(b)(3) superiority factors do not weigh heavily toward class certification. Indeed, the existence

of an overlapping action concerning the same claims and class members indicates that there is no strong interest in individual control of litigation and no particular desirability in concentrating litigation in this forum. Finally, the likely difficulties of managing a class action would likely be exacerbated in managing multiple, overlapping class actions, notwithstanding the presence of shared class counsel. Accordingly, with all due respect to the certification decision of the Northern District of Georgia,[16] I respectfully recommend that the Court deny certification of the nationwide FCRA class in order to avoid the concerns created by overlapping class actions. Alternatively, I recommend that the Court order further briefing from the parties on the issue of whether a stay, consolidation, or transfer of proceedings is warranted under the circumstances. *See, e.g.*, *China Agritech*, 138 S. Ct. at 1811 (noting that "district courts have ample tools at their disposal to manage [overlapping class] suits, including the ability to stay, consolidate, or transfer proceedings.").

Despite this recommendation, I find that the Rule 23(b)(3) superiority factors weigh in favor of certifying the New York Subclass and Capital One Subclass. With respect to those subclasses, the likely cost of litigation as compared with the potential recovery indicates that class members have no strong interest in individually controlling the prosecution or defense of separate actions. Those subclasses also contemplate separate claims not covered by the *Rivera* action, such that the extent and nature of that litigation is not relevant to the decision. Further, the concentration of litigation of NYFCRA class claims in this forum is particularly desirable, as this Court is well

---

[16] *Smith v. Bayer Corp.*, 564 U.S. 299, 317 (2011) (noting that federal courts are expected "to apply principles of comity to each other's class certification decisions when addressing a common dispute"); *see also Mast, Foos, & Co. v. Stover Mfg. Co.*, 177 U.S. 485, 488 (1900) ("Comity is not a rule of law, but one of practice, convenience, and expediency. It is something more than mere courtesy, which implies only deference to the opinion of others, since it has substantial value in securing uniformity of decision, and discouraging repeated litigation of the same question.").

equipped to apply New York law. Finally, there are no particular manageability concerns implicated by these subclass claims.

Accordingly, because the Rule 23(a) and Rule 23(b)(3) factors are satisfied, I respectfully recommend that Your Honor grant Plaintiff's motion for class certification with respect to the New York Subclass and the Capital One Subclass.

D. Rule 23(g)—Class Counsel

Rule 23(g) requires that "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g). The Rule requires that the court consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv). The court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). Defendant raises no objections to Plaintiff's proposed class counsel.

Although Plaintiff is represented by five firms, the proposed order submitted in connection with his motion for class certification lists only four firms. (*See* Proposed Order at 3, 5 (omitting Mallon Consumer Law Group, PLLC)). For those four firms, Plaintiff has submitted exhibits demonstrating the experience, knowledge, and resources of those four listed firms that satisfy the factors outlined in Rule 23 (g). (*See* Firm Bios). Without documentation to consider the credentials of the Mallon Consumer Law Group, PLLC or a request that such firm be appointed class counsel, however, the Court finds that it would be inappropriate to include Mallon Consumer Law Group, PLLC in an order appointing class counsel. Accordingly, I respectfully recommend that Your

Honor appoint Francis Mailman Soumilas, P.C., Robert S. Sola, P.C., Skaar & Feagle, LLP, The Adkins Firm, P.C. as class counsel.

## **CONCLUSION**

For the reasons set forth above, I respectfully recommend that Your Honor (1) grant Plaintiff's request for certification of the New York Subclass, and Capital One Subclass under Rule 23(b)(3); (2) deny Plaintiff's request for certification of the nationwide FCRA Class under Rule 23(b)(3), or alternatively order further briefing from the parties on the issue of whether a stay, consolidation, or transfer of proceedings is warranted in light of the pending *Rivera* Action; (3) deny Plaintiff's request for certification of the Post-Dispute Publication Subclass under Rule 23(b)(3); (4) deny Plaintiff's request for certification under Rule 23(b)(2) with respect to the New York Subclass; (5) appoint Plaintiff as the class representative and Francis Mailman Soumilas, P.C., Robert S. Sola, P.C., Skaar & Feagle, LLP, The Adkins Firm, P.C. as class counsel; and, (6) direct the parties to submit to the Court within thirty days proposed forms and schedules for providing notice to the certified classes.

Any objections to the recommendations made in this Report must be filed with the Clerk of the Court and the Honorable Rachel P. Kovner within fourteen (14) days of receipt hereof. Failure to file timely objections waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

RESPECTFULLY RECOMMENDED.


/s/Ramon E. Reyes, Jr.

RAMON E. REYES, JR.
United States Magistrate Judge

Dated: July 16, 2022
Brooklyn, NY